Filed 7/3/17

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

        Plaintiff and Respondent,

        v.

RUTHETTA LOIS HOPSON,

        Defendant and Appellant.

S228193

Ct.App. 4/1 D066684

Riverside County
Super. Ct. No. RIF1105594

Defendant Ruthetta Lois Hopson was tried on charges that she, along with her boyfriend, Julius Thomas, was responsible for the 2011 murder of her housemate, Laverna Brown. In her trial testimony, defendant pinned the blame on Thomas, who had since died. In rebuttal, the prosecution introduced a confession Thomas had given to detectives following his arrest, in which he pinned much of the blame on defendant. Defendant argues that the admission of Thomas's confession violated her right under the Sixth Amendment to the United States Constitution to confront the witnesses against her. The Court of Appeal rejected the argument, concluding that the claim fails because Thomas's confession was presented not to establish the truth of his account, but instead to undermine defendant's competing account of their joint crime.

We conclude, contrary to the Court of Appeal, that the jury was in fact asked to consider Thomas's confession for its truth and that the admission of the confession thus violated defendant's Sixth Amendment right to confront her accusers. We reverse the judgment of the Court of Appeal and remand for further

**SEE DISSENTING OPINION**

proceedings to determine whether the error was prejudicial in light of other evidence in the case and whether defendant therefore must be given a new trial.

## I.

Defendant and the victim, Brown, both rented rooms in a house in Riverside. Brown planned to fly to Georgia early on October 28, 2011, but she never took the flight. The next day, the police located Brown's minivan in the parking lot of an automobile auction house. Her body and suitcase were found inside. Defendant and Thomas were arrested and charged with Brown's murder. Thomas initially denied involvement, but, three days after his arrest, he gave a confession to detectives that implicated himself and defendant. Thomas also showed the police where he had disposed of items he had used during the crime, which enabled the police to recover one of the murder weapons. Roughly six weeks later, Thomas committed suicide in jail.

At defendant's trial, the content of Thomas's confession to police was presented to the jury. Because the course of events that led to this result was somewhat circuitous — as the Court of Appeal noted, "evidentiary rules were very loosely applied at this trial and few restrictions were observed by either side, or by the trial court" — we describe this history at some length.

Before trial, the prosecution asked the court to rule on the admissibility of various pieces of evidence, including Thomas's confession to police. The defense objected to the admission of Thomas's confession, arguing that admitting the confession would violate defendant's Sixth Amendment right to confront the witnesses against her. The prosecutor agreed he could not introduce Thomas's confession, but advised the trial court that he might wish to revisit the issue at a sidebar if defendant testified and "opened any doors." The trial court ordered Thomas's confession excluded "absent further order of the Court following a

2

sidebar in the event that the prosecution believes that Ms. Hopson may have opened the door with her testimony."

At trial, the prosecution's theory was that defendant needed money and, with Thomas, planned to rob Brown the morning of Brown's trip. During its case-in-chief, the prosecution introduced evidence tending to prove the following: Defendant intended to move into her own apartment around the beginning of November 2011, but she needed money to pay an $800 security deposit. On October 27, the day before the murder, defendant purchased several items, including pepper spray, a folding knife, and a sweatshirt and sweatpants that were too big for her. Thomas called defendant at 1:49 a.m. and 2:09 a.m. on October 28; between calls, he had traveled toward the Riverside house. Brown was killed in the garage early that morning. After the owner of the house awoke around 5:15 a.m., she noticed "things were out of place in the garage" and realized that a butcher knife and machete were missing. Around 6:00 a.m., defendant came home with Thomas; defendant denied knowing anything about the missing machete or knife, and she warned the owner that the sidewalk was wet because she tried to clean up some Coke that she had spilled there. Later that morning, the owner found a bloody blanket in a garbage can; scared, she called 911.

When Brown did not arrive in Georgia on the afternoon of October 28, as scheduled, her daughter became concerned and reported her missing. Brown's daughter also called the owner of the house, who again called 911; she told the dispatcher she suspected defendant was involved in Brown's disappearance. Police investigators interviewed defendant that evening while she was at work, and again the following morning at the police station. At the time of these interviews, defendant was not under arrest. Recordings of the interviews were played for the jury. In the interviews, defendant told police that she had spent the early morning with Thomas, denied knowing what had happened to Brown, and

3

suggested that a homeless person she had seen in the neighborhood may have been involved.

Early on October 29, the police used Thomas's mobile phone records to trace his location. They searched the area and found Brown's minivan nearby. They discovered Brown's body, with her throat cut, and her suitcase inside the minivan. Police then arrested defendant and Thomas for the murder. On November 1, Detectives Rick Cobb and Richard Wheeler conducted a custodial interview of Thomas, following which Thomas showed the detectives where he had dumped clothing and other items used during the crime. The police used this information to recover one of the murder weapons, a machete, which had Brown's blood on it. In the weeks after her arrest, defendant wrote Thomas a letter expressing continuing affection toward him. On December 15, Thomas committed suicide in jail.

Defendant testified in her own defense. She began by describing her relationship with Thomas. Defendant and Thomas had been dating since 2008, but defendant never went to his house and did not know his address. Defendant and Thomas usually saw each other only at the Riverside house, typically late at night to avoid disturbing the owner and Brown. Defendant testified that Thomas had previously told her that he was in a motorcycle club that "did things that were shady," and that he had killed a man. The prosecutor objected to this testimony on hearsay grounds. The trial court overruled the objection and instructed the jury to consider the testimony "for the limited purpose . . . of establishing [defendant's] state of mind at the time the statement was overheard." Defendant went on to testify that Thomas had "made allusions that if we broke up that he would have to take care of me," that is, "[t]hat he would hurt me, possibly kill me."

Defendant's testimony then turned to the events of October 27 and 28, 2011. Defense counsel asked defendant, "[D]id Julius [Thomas] ever tell you that,

4

'Hey, I want to plan a robbery upon Laverna [Brown] before she goes on her trip'?" Defendant responded in the negative. The prosecutor objected on hearsay grounds. The trial court again overruled the objection, stating, "The answer is in." The prosecutor raised no further objections during defendant's direct testimony.

Defendant went on to explain that she had previously told Thomas that Brown was going on a trip to Georgia and had asked if they could spend time together while Brown was away. The day before the murder, defendant purchased a folding knife and pepper spray for personal protection. Thomas had also asked her to buy a gift for his sister, so she bought sweatpants and a sweatshirt, which she gave to Thomas that evening. Thomas called defendant twice around 2:00 a.m. on October 28; in the first call, he told her that he was "on his way" to the Riverside house, and in the second, he told her that "he was there."

Defendant went to the back door of the house and was shocked to see Brown lying in a pool of blood on the garage floor with Thomas standing over her. Thomas was wearing the sweatshirt and sweatpants defendant had purchased, as well as protective foot covers she claimed to have given him months earlier. Thomas told defendant that he needed money, thought Brown would have money because she was going on a trip, and tried to rob her. He told defendant that Brown could identify him, and when Brown began to scream, he sliced her throat with the machete, and then with the butcher knife when the machete proved too dull.

Defendant further testified that she helped Thomas clean up the crime scene because Thomas threatened to hurt her and her adult son if she refused. Defendant and Thomas moved Brown's body into Brown's minivan and cleaned up the murder scene. They wore gloves defendant kept in her room and used cleaning supplies stored in the garage. Thomas told defendant to put Brown's suitcase in the minivan to make it look like Brown had gone on her trip. Defendant, driving

5

Brown's minivan, followed Thomas to the automobile auction house, where they abandoned Brown's vehicle, with her body and suitcase inside. They bought food at McDonald's and two Cokes from 7-Eleven, then returned to the Riverside house; Thomas told defendant to pour the Coke on the bloodstains to eliminate them.

On cross-examination, defendant admitted that she knew Thomas had "spoke[n] to police officers" and "shown the police where the murder weapon was." She volunteered that "[h]e also lied and said that I had . . . something to do with it, and I did did [*sic*] not." She acknowledged that Thomas had never been violent with her; that she had referred to Thomas with affection, even after he died; and that she did not warn her son of Thomas's threats. She testified that she continued to fear Thomas because he had told her, " 'Snitches always die,' and one way or another he would get to me."

At the beginning of defendant's second day of cross-examination, the prosecutor asked the trial court at sidebar to admit Thomas's confession "under [Evidence Code section] 1202 . . . to impeach the hearsay declarations that came in through the defendant." Defense counsel renewed his earlier confrontation clause objection: "Just under *Crawford* [*v. Washington* (2004) 541 U.S. 36], I believe that just because my client testifies to her state of mind as to what happened in the garage, what she heard the killer say, I don't think allows us to bring in his statements that he told police days later." The trial court agreed with the prosecution and ruled "that under 1202 that the prior inconsistent statements would be admissible for that limited purpose." The trial court did not request an offer of proof or explain its reasoning on the record, but it did allude to a discussion of the issue held during a prior in-chambers conference, a transcript of which is not in the record.

On redirect examination, defendant admitted that she had read a police report detailing Thomas's confession, acknowledged that Thomas had accused her of planning the crime, and denied that his confession was true. While defense counsel was asking the next question, the prosecutor raised a hearsay objection, which the trial court overruled without comment. Defense counsel went on to ask defendant other questions about what she had read in the police report and what happened on the night of the murder; defendant denied that Thomas's confession and the events outlined in it were true.[1] The prosecutor raised no further objections.

In rebuttal, the prosecution called Detective Wheeler to testify about Thomas's confession. Although the trial court had previously indicated that the confession would be admissible for a limited purpose, defense counsel did not request a limiting instruction, and none was given.

Detective Wheeler testified as follows. On November 1, while in custody, Thomas decided to tell police the truth, because he wanted to "make it right for Laverna's family." Thomas was crying, upset, and apologetic while confessing. Thomas said defendant suggested robbing Brown because Brown was going on a trip, would have money, and would be an easy target. Defendant devised a plan a few days in advance and provided the sweatshirt and sweatpants for Thomas to

---

[1]     For example: "Q. And basically from what you read, what did you read that Julius accused you of? [¶] A. He accused me of planning it, of helping him, and I did not help him. [¶] Q. Were his statements true that he told police? [¶] A. No. [¶] Q. Did you tell Julius that Laverna would be leaving on a trip and that you felt that Laverna would have a good amount of money with her on that trip? . . . [¶] A. No, I never told him that. [¶] Q. Did you tell Julius that you and [he] should rob Laverna for her money? [¶] A. Never. [¶] Q. Did you tell Julius that the plan was to have Julius hide in the garage while you convinced Laverna to come into the garage and help Laverna [*sic*] with something? [¶] A. Never. I never did that."

7

wear during the robbery. When Thomas arrived at the Riverside house on October 28, he told defendant he did not want to go through with the plan, but defendant convinced him to. Defendant lured Brown into the garage, and Thomas hit her with the machete. Thomas later saw defendant kneeling over Brown's body with a bloody butcher knife. When it became obvious that Brown was dead, Thomas wanted to call the police, but defendant suggested getting rid of Brown's body instead, because nobody would expect her to be around for a few days. Defendant put Brown's suitcase in her minivan, directed the cleanup effort, and drove Brown's vehicle to the automobile auction house, while Thomas followed. Afterward, they went to McDonald's, where only defendant ordered and ate food. They returned to the Riverside house, and defendant poured Coke on the bloodstains, because she had seen on a television show that Coke "somehow break[s] up the blood and make[s] it easier to clean." Defense counsel raised only a single objection, not relevant here, during the course of this testimony.[2]

During closing argument, the prosecutor argued to the jury that Thomas's confession supplied evidence that defendant was the "direct perpetrator." In his closing argument, defense counsel contended that "[t]he biggest question is who is telling the truth" and attempted to discredit Thomas's confession. During his rebuttal to the defense closing argument, the prosecutor argued that Thomas's actions in admitting his role in the crime made him more credible than defendant. Defense counsel raised no objections during the prosecutor's closing arguments.

The jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a)) and found true special circumstances that defendant intentionally murdered Brown while lying in wait (*id.*, § 190.2, subd. (a)(15)) and murdered

---

[2] Other testimony and several additional letters between Thomas and defendant were introduced during the rebuttal and surrebuttal cases. This evidence is not relevant to the question presented here.

8

Brown while engaged in the commission of a robbery or attempted robbery (*id.*, subd. (a)(17)(A)). The trial court sentenced defendant to life imprisonment without the possibility of parole.

On appeal, defendant argued that the admission of Thomas's confession violated her constitutional right to confront Thomas. The Court of Appeal found no constitutional violation because Thomas's confession was not introduced for its truth, but instead to undermine the credibility of defendant's own account.

We granted review to consider whether the admission of Thomas's confession violated defendant's Sixth Amendment confrontation right. Our review is de novo. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.)

## II.

## A.

The confrontation clause of the Sixth Amendment to the United States Constitution, which is binding on the states under the Fourteenth Amendment, guarantees the right of a criminal defendant "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.; see *Pointer v. Texas* (1965) 380 U.S. 400, 406.) The understanding of the clause's protections has shifted over time. Although the United States Supreme Court at one time interpreted the clause to bar admission of out-of-court statements that lacked "adequate 'indicia of reliability' " (*Ohio v. Roberts* (1980) 448 U.S. 56, 66), the court reconsidered this approach in *Crawford v. Washington*, *supra*, 541 U.S. 36 (*Crawford*). Tracing the historical origins of the confrontation right, the court explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." (*Id.* at p. 50.) Interpreting the clause with this focus in mind, the court held that the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to

9

testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53–54; accord, *Davis v. Washington* (2006) 547 U.S. 813, 821.)

It is undisputed that Thomas's postarrest confession to police — which defendant had no opportunity to test through cross-examination — qualifies as testimonial within the meaning of *Crawford*. Indeed, *Crawford* itself identified unconfronted accomplice statements to authorities as "core testimonial statements that the Confrontation Clause plainly meant to exclude." (*Crawford*, *supra*, 541 U.S. at p. 63; see also, e.g., *Michigan v. Bryant* (2011) 562 U.S. 344, 358.) But in a portion of the opinion central to the case before us, the high court in *Crawford* also made clear that this rule of exclusion applies only to testimonial *hearsay*; the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted" — that is, for nonhearsay purposes. (*Crawford*, at p. 60, fn. 9, citing *Tennessee v. Street* (1985) 471 U.S. 409, 414; see also *People v. Sanchez* (2016) 63 Cal.4th 665, 682 [describing the "not-for-the-truth limitation" on the confrontation right].) The principal question we confront here is whether Thomas's un-cross-examined confession was used for such a nonhearsay purpose, or whether it was instead used "as evidence against the accused," in violation of defendant's Sixth Amendment rights. (*Crawford*, at p. 50.)[3]

---

[3] In *People v. Sanchez*, *supra*, 63 Cal.4th 665, we examined the development of the high court's *Crawford* jurisprudence and instructed courts addressing the admissibility of out-of-court statements to undertake a two-step analysis. "The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Id.* at p. 680.) The primary

*(Footnote continued on next page.)*

**1.**

The first, and most basic, requirement for applying the not-for-the-truth limitation on the confrontation right is that the out-of-court statement must be offered for some purpose independent of the truth of the matters it asserts. That means that the statement must be capable of serving its nonhearsay purpose regardless of whether the jury believes the matters asserted to be true. (See *People v. Sanchez*, *supra*, 63 Cal.4th at pp. 682, 684; see also, e.g., 2 McCormick on Evidence (7th ed. 2013) The Hearsay Rule, § 249, p. 189, fn. 2 ["if in fact the statement must be true for the inference desired, then the ostensible nonhearsay use is invalid"].)

In ruling Thomas's confession admissible, the trial court relied on Evidence Code section 1202, which provides that "[e]vidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant . . . ." The trial court evidently reasoned that once defendant testified about statements Thomas had made to her on the night of the murder, Thomas's confession was admissible under section 1202 for

---

*(Footnote continued from previous page.)*

question in this case centers on whether Thomas's confession was "offered to prove the truth of the facts it assert[ed]," and therefore qualified as testimonial hearsay for purposes of the confrontation clause.

Rather than focus on this question, the dissent changes the subject. Advancing a theory no party has raised, the dissent argues that the prosecution was justified in using Thomas's confession to prove the truth of the facts asserted because defendant had testified on cross-examination that she knew Thomas made a statement saying she "had . . . something to do with it," and that the statement was a lie. (See dis. opn., *post*, at pp. 22–27, 30–31.) The dissent's theory is addressed in footnote 7, *post*.

11

the nonhearsay purpose of undermining his credibility as a hearsay declarant. The Attorney General urges us to uphold the trial court's ruling on this basis.

There are two problems with this argument. First, the trial court's ruling created an unexplained inconsistency with its earlier rulings permitting defendant to testify about statements Thomas had made to her. Both the trial court and the parties appeared to understand this testimony to have been admitted for the nonhearsay purpose of explaining defendant's state of mind at the murder scene and her reasons for assisting Thomas in the coverup. (See, e.g., *People v. Montes* (2014) 58 Cal.4th 809, 863.) As the Court of Appeal noted, defendant "did not obtain admission of the truth of Thomas's 'threatening' statements, simply by the way she reported them." The probative value of the statements introduced for this purpose depended on whether Thomas actually made the statements to defendant, which was a question of defendant's credibility, not Thomas's, and whether defendant believed the statements to be true — not whether they were indeed true. (See *Dutton v. Evans* (1970) 400 U.S. 74, 88–89; 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 38, pp. 831–832; 2 McCormick on Evidence, *supra*, The Hearsay Rule, § 249, pp. 191–193.) It may well be that some of defendant's testimony tested the bounds of this state of mind rationale; as the Attorney General notes, defendant no doubt *hoped* the jury would believe that Thomas had, in fact, killed Brown alone for purposes of financial gain, as she reported Thomas had said. But the prosecution did not object at trial that defendant had crossed a line with her testimony, and the apparent assumption at trial was that the statements had been admitted for a limited nonhearsay purpose. As the Court of Appeal rightly noted, for the trial court then to admit Thomas's confession for purposes of impeaching him as a hearsay declarant, thereby overruling defendant's confrontation clause objection, was something of a non sequitur. (Evid. Code, § 1202; see *People v. Curl* (2009) 46 Cal.4th 339, 362 [section 1202 does not

12

authorize admitting evidence to impeach the credibility of a statement that was offered for a nonhearsay purpose].)

But the second and more fundamental problem with the argument is that the jury was never informed of the limited nonhearsay purpose for which Thomas's confession was ostensibly admitted, and, critically, the prosecution did not use Thomas's confession for any such limited purpose. The prosecution instead used Thomas's confession to establish the role that defendant had played in the murder — that is, for the truth of his out-of-court statements. If the prosecution had intended simply to impeach Thomas's credibility — that is, to demonstrate that Thomas was an unreliable witness — it would have sufficed to present his inconsistent statements. Of course, doing so would have undermined the credibility of *all* of Thomas's out-of-court statements, including his confession to detectives, which was favorable to the prosecution. (See, e.g., 1 McCormick on Evidence, *supra*, Impeachment and Support, § 34, p. 209.) The prosecution instead sought to bolster the credibility of Thomas's confession by eliciting testimony from Detective Wheeler that Thomas, while confessing, "was a complete mess sitting across from me and talking, crying, almost couldn't catch his breath, apologizing profusely for not being honest initially. And he just said that he wanted to make it right for Laverna's family and he wanted to tell me the truth about what happened, and then he proceeded to do so." This testimony was irrelevant if the confession was offered to prove Thomas's lack of credibility and not the truth of the matters asserted. Put differently, Thomas's "credibility was important only if the prosecution was using his statement to prove the truth of its contents — in other words, his credibility mattered only if his statement was in fact inadmissible hearsay." (*Jones v. Basinger* (7th Cir. 2011) 635 F.3d 1030, 1043.)

13

That the prosecution relied on Thomas's confession to establish the truth of his out-of-court statements is plain from the prosecutor's closing argument, in which he expressly referred to Thomas's confession as substantive evidence against defendant: "In this case, there is evidence that the defendant is the direct perpetrator, that she had the bloody knife, the butcher knife in her hand while she was leaning over the body of Laverna Brown. You heard that through the statements of Julius Thomas that Detective Wheeler told us about." And later: "We heard from Detective Wheeler that Julius Thomas actually told Detective Wheeler . . . it was [defendant's] plan that he would hide in the garage, and she would create some secret plan to get Laverna out of her room and into the garage." Furthermore, in rebutting defense counsel's argument that Thomas was lying to the police when he confessed, the prosecutor expressly invited the jury to believe Thomas's confession over defendant's testimony, again offering the confession for its truth. (See, e.g., 3A Wigmore on Evidence (Chadbourn ed. 1970) Specific Error (Contradiction), § 1000, pp. 956–958.) He argued: "So what does [defendant] do? She had to take the stand and had to try and give an explanation for every one of the pieces of that evidence, and each time she did that, it was a lie. . . . [¶] . . . [¶] But what did [Thomas] do? He admitted his role. He came clean with the police and said, 'I'm sorry,' crying, 'Tell Laverna's family sorry.' 'Here, let me take you to the murder weapon. Let me take you to where the bloody clothing is.' That's what shocked her, because he gave it up, because he could not take the weight of what he had done and keep quiet. [¶] You compare that person to the defendant's statements when she's talking to [the police], and you see right there the difference between the two. You see a cold-blooded killer who can lie to the police, who can look Detective Cobb in the face and say nothing. And then you have Julius Thomas who breaks down, *tells the police the truth*, understands the weight of the enormity of what he had done, explains it was

14

the defendant's plan and takes the police to the evidence that would bury him."
(Italics added.)

In sum, the record belies any claim that the prosecution used Thomas's confession for the limited nonhearsay purpose of impeaching the statements defendant had attributed to Thomas in her testimony. The prosecution instead relied on Thomas's confession to contradict defendant's testimony by establishing a different account of the events surrounding the crime, which the prosecution expressly and repeatedly invited the jury to consider for its truth.

**2.**

The Court of Appeal below recognized that "the apparent purpose of the rebuttal testimony from Detective Wheeler was to attack the credibility of Hopson as a testifying defendant," not to undermine Thomas's own credibility. But the court nevertheless found no confrontation clause violation, comparing this case to *Tennessee v. Street*, *supra*, 471 U.S. 409 (*Street*), the source of *Crawford*'s not-for-the-truth limitation on the confrontation right. A fair comparison with *Street*, however, leads to a contrary conclusion.

In *Street*, a murder case, the prosecution relied heavily on a "detailed confession" the defendant had given authorities. (*Street*, *supra*, 471 U.S. at p. 411.) Testifying in his own defense, the defendant recanted the confession, claiming that the sheriff had coerced him into repeating a confession given by his alleged accomplice, Peele. (*Ibid.*) To rebut the claim, the prosecution had the sheriff read Peele's confession to the jury and answer additional questions, "emphasizing the differences between the confessions." (*Id.* at p. 412.) The prosecutor then "referred to Peele's confession in his closing argument to dispute [the defendant's] claim that he had been forced to repeat Peele's statement." (*Ibid.*)

15

The high court upheld the trial court's ruling, concluding that the evidence had been admitted "for the legitimate, nonhearsay purpose of rebutting [the defendant's] testimony that his own confession was a coerced 'copy' of Peele's statement." (*Street*, *supra*, 471 U.S. at p. 417.) The court concluded that "[t]he *nonhearsay* aspect of Peele's confession — not to prove what happened at the murder scene but to prove what happened when [the defendant] confessed — raises no Confrontation Clause concerns." (*Id.* at p. 414.) The high court stressed that the impeachment value of Peele's confession did not derive from the truth of the matters asserted, but from the bare fact that Peele's account differed from the defendant's, which undermined the defendant's claim that the sheriff had coerced him into repeating Peele's confession as his own. By contrast, the high court recognized that "[i]f the jury had been asked to infer that Peele's confession proved that [the defendant] participated in the murder, then the evidence would have been hearsay; and because Peele was not available for cross-examination, Confrontation Clause concerns would have been implicated." (*Ibid.*; see also *Dutton v. Evans*, *supra*, 400 U.S. at pp. 88–89.)

The Court of Appeal found that "[w]ithin the scope of *Street*, *supra*, 471 U.S. 409, the jury was properly given the opportunity to compare the two versions by the two participants about what happened in the garage the night that Brown was killed, to decide whether Hopson was telling the truth about 'the immediate issue of coercion,' which was her theory of defense. (*Id.* at p. 416.)" But this line of reasoning finds no support in *Street*. The high court in that case recognized that if the prosecution had used Peele's confession to prove what happened at the murder scene, "the evidence would have been hearsay; and because Peele was not available for cross-examination, Confrontation Clause concerns would have been implicated." (*Id.* at p. 414.) So it is here: Whether defendant was coerced into helping Thomas cover up the crime was a question of what happened *at the*

16

*murder scene*.  Thomas's confession cast doubt on "whether Hopson was telling the truth about 'the immediate issue of coercion' " because the jury was asked to conclude that his confession was true and defendant's testimony was not.

Moreover, as the high court in *Street* noted, in that case "[t]he jury's attention was directed to th[e] distinctive and limited purpose" for which the evidence had been admitted by "the prosecutor's questions and closing argument," and the jury was "pointedly instructed by the trial court 'not to consider the truthfulness of [Peele's] statement in any way whatsoever.' " (*Street*, *supra*, 471 U.S. at pp. 417, 414–415.)  The court acknowledged that "Peele's statement . . . could have been misused by the jury." (*Id.* at p. 414.)  But because the prosecution had restricted its questioning and argument to the limited nonhearsay purpose for which Peele's confession had been offered — by "emphasiz[ing] the differences" between Peele's confession and the defendant's — the court concluded "that the trial judge's instructions were the appropriate way to limit the jury's use of [Peele's confession] in a manner consistent with the Confrontation Clause." (*Id.* at pp. 416, 417.)  No similar limitations were observed in this case. On the contrary, the prosecution's questioning and arguments expressly invited the jury to rely on Thomas's out-of-court confession to detectives as a true account of the events surrounding the crime.[4]

---

[4]     These circumstances also distinguish this case from several out-of-state authorities that allowed testimonial statements to be admitted for nonhearsay purposes.  (See, e.g., *State v. Araujo* (Kan. 2007) 169 P.3d 1123, 1127–1128 [in a bench trial, no confrontation clause violation in admitting statements when the trial court made clear the limited purpose for which the statements were introduced and did not use them for their truth in its findings]; *Le v. State* (Miss. 2005) 913 So.2d 913, 940–943 [no confrontation clause violation in admitting a deceased accomplice's police statement when offered to impeach the accomplice's statements offered by the defendant, a limiting instruction was given, and the record did not suggest that the prosecutor sought to present the police statement as

*(Footnote continued on next page.)*

17

**3.**

The Attorney General advances other possible nonhearsay purposes for which Thomas's confession might have been introduced at trial. But neither the prosecution nor the trial court raised or relied on these theories of admissibility, and the use of Thomas's confession was not confined to any of the limited nonhearsay purposes the Attorney General now outlines. Each of these post hoc justifications for the trial court's ruling thus fails for substantially the same reason: In the end, Thomas's confession was not actually used for any of these purported nonhearsay purposes, but was instead used for the illegitimate purpose of establishing defendant's role in the crime. (Cf. *Shepard v. United States* (1933) 290 U.S. 96, 103 ["A trial becomes unfair if testimony" admitted and used for an illegitimate purpose "may be used in an appellate court as though admitted for a different purpose, unavowed and unsuspected."].)

For example, the Attorney General argues Thomas's confession could have been used for the nonhearsay purpose of impeaching defendant insofar as "Thomas's statements to the police that he and [defendant] both planned the crime made it less likely that Thomas really admitted to [defendant] that he committed the crime alone." According to the Attorney General's brief, the truth of Thomas's confession is irrelevant for this purpose, since "the jurors could disbelieve the substance of what Thomas said to the police but also disbelieve [defendant's] testimony about what Thomas supposedly told her." Even if we

_____

*(Footnote continued from previous page.)*

hearsay]; *Del Carmen Hernandez v. State* (Tex.Crim.App. 2008) 273 S.W.3d 685, 689 [similar]; *Hodges v. Commonwealth* (Va. 2006) 634 S.E.2d 680, 687 [no confrontation clause violation in admitting a written police statement when no limiting instruction was requested or given, but the prosecution did not use it "as proof of the veracity of its contents"].)

18

were to accept the premise of the argument — and we have no occasion to pass on its correctness here — the Attorney General's argument would fail.  The prosecution did not argue at trial that Thomas's confession, regardless of its truth, made it less likely that Thomas made the statements defendant had attributed to him.  Instead, as previously discussed, the prosecution expressly asked the jury to believe that the content of Thomas's confession to detectives was true, and to credit it over defendant's testimony.

The Attorney General also argues that Thomas's confession could have been admitted for the nonhearsay purpose of impeaching defendant's explanation of why she changed her story at trial.  Comparing this case to *People v. Carter* (2003) 30 Cal.4th 1166, 1206–1209, the Attorney General argues that Thomas's confession "impeached the credibility of [defendant's] claim that she hid the truth because she was afraid of [Thomas] [and] suggested a different explanation for [her] morphing narrative, namely, that [defendant] changed her story because she had to account for what Thomas told the police."  It is not evident how Thomas's confession could have served such a purpose.  Far from "account[ing] for what Thomas told the police," defendant's trial testimony affirmatively contradicted it.  The prosecutor's questioning of Detective Wheeler about Thomas's confession did nothing to illuminate why defendant changed her story, and the prosecutor never made any argument that the two events were somehow related.  The prosecutor instead argued that defendant had testified in a manner calculated to explain away the evidence adduced during the prosecution's case-in-chief — that is, before Thomas's confession was introduced, and indeed, before the trial court even ruled it admissible.  Thomas's confession was extraneous to this line of argument.  The confession was instead used to buttress the prosecutor's argument that defendant's version of events was false, while Thomas's version, as recounted to the police and related to the jury by Detective Wheeler, was true.

19

**B.**

In the alternative, the Attorney General argues that even if Thomas's unconfronted confession was admitted for its truth, defendant opened the door to that use with her testimony. The Attorney General raises this argument for the first time in his briefs in this court, having made no such argument below.[5] The idea that defendant had "opened the door" was introduced by the Court of Appeal, which apparently viewed the rationale as complementary to its primary holding that Thomas's confession had not been admitted for its truth: The court concluded that, by testifying "in layers of multiple hearsay" and bringing "Thomas's character and actions into issue as her key defense point," defendant had opened the door to the "*nonhearsay* uses" of Thomas's confession we have considered and rejected above. (Italics added.) At the conclusion of its analysis, however, the court went on to state, without elaboration, that "[e]ven if . . . there were a confrontation clause problem posed by Thomas's reported testimonial statements, in the nature of 'bleeding over' from impeachment into substantive evidence about the identity of the killer," defendant had opened the door to that result as well.

Although the Attorney General seizes on the Court of Appeal's unelaborated statement that defendant might have opened the door to the use of Thomas's confession as substantive evidence of her role in the crime, the Attorney General argues this is so for a different reason: Defendant's testimony left the jury with the incomplete and misleading impression that Thomas's "statements recounted by [defendant] — which implicated Thomas and no one else — were the only statements that Thomas made about the crime." The Attorney General

[5] The various opening the door cases and theories discussed in the Court of Appeal's opinion and the Attorney General's brief in this court were not raised in the Attorney General's Court of Appeal brief, any letter brief (none was filed), or at oral argument before the Court of Appeal (which was waived).

20

argues that it was necessary to introduce Thomas's confession, which he gave several days after the murder, to dispel that impression. We reject this argument.

To start, the Attorney General is incorrect that defendant misled the jury about the extent of Thomas's statements. Defendant testified regarding her version of events; although she may have conveyed more of Thomas's out-of-court statements than was strictly necessary to explain her role in the coverup, she did so without objection and did not leave the jury with any false impression that Thomas's statements to her were the only statements he had made about the crime. On the contrary, the jury would have been well aware that Thomas had made other statements: During the prosecution's case-in-chief, Detective Cobb testified that police had interviewed Thomas on November 1, after which Thomas showed the police where he had disposed of clothing and other items used during the murder. Later, when cross-examined by the prosecutor, defendant admitted that she knew Thomas had given a confession implicating her during that interview, a point she reiterated in her redirect examination.

In any event, even if defendant had left the misimpression that Thomas had made no other statement about his role in the murder, the admission of Thomas's full confession, as recounted by Detective Wheeler on the stand, ventured far beyond what (if anything) would have been necessary to dispel it. Courts recognizing an opening the door exception to the confrontation right have recognized it must be a limited one, lest the exception swallow the usual confrontation rule. Most of the cases the Attorney General cites as support for his opening the door theory stand for a separate, modest proposition with which we have already agreed: If a defendant selectively introduces portions of an out-of-court testimonial statement, he or she may not object to the admission of "the

21

whole on the same subject." (Evid. Code, § 356; see *People v. Vines* (2011) 51 Cal.4th 830, 861–863.)[6] That, of course, is not what happened here.

The Attorney General also cites a handful of cases in which courts have concluded that the defendant opened the door to the admission of limited testimonial statements as necessary to clarify, rebut, or complete a particular issue, such as questions concerning the adequacy of a police investigation. (See *U.S. v. Cruz-Diaz* (1st Cir. 2008) 550 F.3d 169, 175–181 [a police officer's short statement about what the codefendant told him was admissible for the limited purpose of rebutting the defendant's characterization of the investigation as inadequate and providing context for the investigator's actions]; *U.S. v. Acosta* (5th Cir. 2007) 475 F.3d 677, 682–683 [a trial witness's out-of-court statement was admissible for the limited purpose of showing his trial testimony was not a recent fabrication, as implied by the defendant]; *People v. Reid* (N.Y. 2012) 971 N.E.2d 353, 356–357 [by using out-of-court statements to imply that someone else was responsible for the crime and to question the adequacy of the police investigation, the defendant opened the door to testimony that an eyewitness had told the police the other person was not present at the crime scene]; cf. *Charles v. Thaler* (5th Cir. 2011) 629 F.3d 494, 502–503 [during the punishment phase of a noncapital trial, the defendant portrayed himself as "a good kid with a nearly blameless past" and denied instances of school misconduct, opening the door to a

---

[6]    The Attorney General does not cite *People v. Vines*, *supra*, 51 Cal.4th 830, but he does cite several out-of-state authorities that are to similar effect. (See *Tinker v. State* (Ala.Crim.App. 2005) 932 So.2d 168, 187–188; *People v. Rogers* (Colo.Ct.App. 2012) 317 P.3d 1280, 1284; *State v. Brooks* (Hawaii Ct.App. 2011) 264 P.3d 40, 51; *State v. Fisher* (Kan. 2007) 154 P.3d 455, 481–483; *People v. Ko* (N.Y.App.Div. 2005) 789 N.Y.S.2d 43, 45; *McClenton v. State* (Tex.App. 2005) 167 S.W.3d 86, 94; see also *Ko v. Burge* (S.D.N.Y. Feb. 26, 2008) 2008 WL 552629, *12–*13.)

question about why school officials had told the prosecution about the misconduct that he denied]; *id.* at p. 503 [the confrontation clause does not apply in the context of noncapital sentencing].)  We need not pass on the correctness of these decisions, because they provide little support for the Attorney General's argument in any event.  As counsel candidly acknowledged at oral argument, none of these decisions purports to authorize what the Attorney General seeks here:  admission of a nontestifying accomplice's testimonial statements, for their truth, because the defendant claimed the accomplice made different, nontestimonial statements at a different time and in a different place.

Nor is this case analogous to *U.S. v. Lopez-Medina* (10th Cir. 2010) 596 F.3d 716.  In that case, defense counsel questioned a police officer regarding information he had that came from a confidential informant.  (*Id.* at p. 726.)  The prosecutor asked for a sidebar and "expressed concern about this line of questioning." (*Ibid.*)  Defense counsel then explained to the court:  " 'I think, Your Honor, [the government is] worried that I am going to bring in the confidential informant information.  That's my full intention.  I don't care what door we open.  If I open up a door, please feel free to drive into it.' " (*Ibid.*)  The appellate court affirmed the admission of other testimony regarding the informant's statements because the defendant had "purposefully and explicitly" waived his confrontation right, opening the door to that testimony.  (*Id.* at p. 731.)  That is not what occurred here.  Granted, at a pretrial hearing, the prosecutor alerted the trial court and defense counsel that he might seek to admit Thomas's statements "depend[ing] on how [defendant] testifies."  Unlike in *Lopez-Medina*, however, this colloquy did not put defendant on notice of what precise testimony the prosecution thought would open the door to Thomas's confession.  Nor did the prosecution contemporaneously object to the testimony that the Attorney General now claims opened the door to the admission of testimony about Thomas's

23

confession. Nor, finally, can it be said that defendant clearly and unambiguously waived her right to confront her accomplice, Thomas, about his confession by attributing other statements to Thomas during her own testimony.**7**

---

**7** The dissent advances a different theory of waiver: It argues that defendant implicitly waived her right to confront Thomas when she testified on cross-examination that she knew Thomas had made a statement implicating her and that the statement was a lie. (See dis. opn., *post*, at pp. 22–27, 30–31.) In so doing, the dissent conducts the parties' litigation for them, for the Attorney General has never sought, as the dissent does, to justify the prosecution's use of Thomas's full, unconfronted confession as a necessary response to defendant's brief reference to the confession on cross-examination. And because the Attorney General has not raised this waiver argument, defendant has had no opportunity to respond to it. It is not the practice of this court to decide cases on grounds the parties have neither briefed nor argued, and the dissent offers no sound reason to depart from that practice here.

The dissent's argument is faulty in any event. The premise of the argument is that defendant's statement that Thomas's confession was false put the prosecution at an unfair disadvantage, entitling the prosecution to level the field by admitting Thomas's full, unconfronted confession. But defendant's statement did not disadvantage the prosecution (and again, the Attorney General does not claim that it did). The prosecutor had adverted to Thomas's November 1 police interview during the prosecution's case-in-chief, and he later cross-examined defendant regarding her knowledge of Thomas's confession. Defendant candidly admitted that she knew Thomas had confessed to detectives, and that he had accused her of planning the crime. By testifying that this accusation was false, defendant did not rely on any aspect of Thomas's confession for its truth; rather, she acknowledged the existence of a version of events that conflicted with her own.

The notion that defendant sought to use her confrontation right as a "sword" (dis. opn., *post*, at p. 31) might have force if defendant had misrepresented the content of Thomas's confession to her advantage, but she did not. (Cf. Evid. Code, § 356; *People v. Vines*, *supra*, 51 Cal.4th at pp. 861–863.) The only representation she made about the content of the confession was both indisputably accurate and, if anything, more helpful to the prosecution than it was to her: She informed the jury that Thomas had told detectives that she "had . . . something to do with it." Nor did defendant's testimony undermine any efforts the prosecution might have wished to make to attack Thomas's credibility under Evidence Code section 1202, as the dissent suggests (see dis. opn., *post*, at pp. 21–

*(Footnote continued on next page.)*

24

We find more instructive the cases the Attorney General cites in which the courts have rejected arguments for introducing inculpatory testimonial statements on grounds that the defendant opened the door. For example, one federal appellate court held that, by questioning a police officer about the evidence that tied the defendant to a residence where drugs were dealt, the defendant "did not open the door so wide as to allow [the officer] to recite the full extent of the statements from [a confidential informant] implicating [the defendant] in selling drugs and possessing firearms." (*U.S. v. Holmes* (8th Cir. 2010) 620 F.3d 836, 844; see also *U.S. v. Pugh* (6th Cir. 2005) 405 F.3d 390, 400 [by raising the issue of a detective's motive for transporting a witness from jail to the police station, one defendant "may have 'opened the door' to allow the Government to provide an alternative reason for questioning [the witness], but the Government overstepped constitutional bounds by asking [the detective] if [the witness] identified the defendants as the robbers"]; *Lane v. State* (Ind.Ct.App. 2013) 997 N.E.2d 83, 91 [by asking a detective "if there was nothing else that tied [the defendant] to the crime[,]" the defendant did not open the door to evidence linking him to a phone number that the victim called four times]; *McClenton v. State*, *supra*, 167 S.W.3d at p. 94 [by asking questions about one accomplice's out-of-court statement, the defendant opened the door to that accomplice's entire statement but not to another accomplice's out-of-court statement].) Similarly here, if the goal were simply to correct an incomplete and misleading impression that Thomas's statements to

*(Footnote continued from previous page.)*

22); Thomas's confession could have impeached his credibility as a putative hearsay declarant even if — and perhaps especially if — his confession to detectives were false. Ultimately, the contention that the prosecution was unfairly disadvantaged by this testimony would make sense only if the prosecution had somehow been entitled to rely on Thomas's out-of-court, unconfronted confession for its truth. It was not so entitled. (See *Crawford*, *supra*, 541 U.S. at pp. 53–54.)

25

defendant were the only statements that Thomas made about the crime, it would have sufficed to confirm that Thomas later gave police a statement, "without the need to go into the damning details" of what he said. (*Holmes*, at p. 842.)

The Attorney General protests that this result gives criminal defendants "carte blanche to testify that any unavailable witness took credit for the crime, and there would be nothing the prosecution could do about it." Not so. For one thing, if the prosecution in this case had been concerned about defendant's testimony that Thomas had taken credit for the crime, it could have objected to the testimony on hearsay or other evidentiary grounds, or it could have asked that the jury be admonished to consider the testimony only for the limited purpose of considering the statements' effect on defendant's state of mind. It did neither. The prosecution instead waited until defendant's direct examination was over, introduced a detailed recounting of Thomas's confession for the putative purpose of impeaching Thomas's credibility as a hearsay declarant, and then relied on the confession as substantive evidence of defendant's role in the murder.

It is, in any event, well established that the prosecution can impeach a testifying defendant, just like any other witness. (*Portuondo v. Agard* (2000) 529 U.S. 61, 69.) The prosecution is always entitled to point out a defendant's motivation to divert blame to an unavailable accomplice and present admissible facts that contradict the defendant's story. And it may be possible, in appropriate cases, for the prosecution to argue that the defendant has opened the door to admission of otherwise inadmissible testimonial statements. We do not adopt here a general opening the door exception to the confrontation right or decide the scope of any such exception. It is enough to say here that defendant in this case did not, as the Attorney General now argues, give the prosecution carte blanche to introduce her accomplice's full, unconfronted extrajudicial confession — for its truth — by creating an incomplete and misleading impression that the statements

26

she attributed to him were the only statements Thomas had made about the crime.

### III.

*Crawford* makes clear that the prosecution may not ask the jury to credit an accomplice's out-of-court stationhouse confession shifting or spreading blame to the defendant unless the defendant has had the opportunity to test the accomplice's reliability in the "crucible of cross-examination." (*Crawford*, *supra*, 541 U.S. at p. 61.) In this case, as the Court of Appeal observed, "evidentiary rules were very loosely applied . . . and few restrictions were observed by either side, or by the trial court." The end result was that an accomplice's confession implicating the defendant was used as substantive evidence of her role in the crime, even though she had no opportunity to test his reliability through cross-examination. This violated defendant's right of confrontation.

The Attorney General argues that any violation of defendant's Sixth Amendment rights was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; see, e.g., *People v. Pearson* (2013) 56 Cal.4th 393, 463.) The Attorney General argues the evidence of defendant's guilt was sufficiently overwhelming that there was no reasonable possibility that the jury verdict could have been affected by the admission of Thomas's confession. (See also dis. opn., *post*, at pp. 32–36.) Defendant, however, points out that Thomas's confession was both powerfully incriminating and provided the only direct evidence of defendant's role in the murder, which explains why the prosecutor relied on the confession so heavily in his arguments to the jury.

Because the Court of Appeal concluded that defendant's constitutional right to confront Thomas had not been violated, it did not address these arguments. "[W]e 'consider it appropriate to remand this matter to the Court of Appeal to permit that court to determine' the question in the first instance." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1135; see Cal. Rules of Court, rule 8.528, subd. (c).)

## IV.

The judgment of the Court of Appeal is reversed and the case remanded for further proceedings consistent with this opinion.

**KRUGER, J.**

**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**

**DISSENTING OPINION BY CANTIL-SAKAUYE, C. J.**

The problem of suspects giving conflicting stories when interrogated has been well documented not only by police, but also in our case law. (*People v. Tobias* (2001) 25 Cal.4th 327, 331 ["an accomplice may try to shift blame to the defendant in an effort to minimize his or her own culpability"]; *People v. Duarte* (2000) 24 Cal.4th 603, 615 [recognizing that suspects accused of criminal behavior often will attempt " 'to shift blame or curry favor' "]; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1006 [recognizing that defendant has an incentive to make another defendant appear more " 'blameworthy'" in the context of a capital case].)

The present matter is no different.

Here, the police arrested partners in crime who were then questioned separately. Their versions conflicted about the circumstances of the wrongdoing. Defendant Ruthetta Lois Hopson told police that she knew nothing about the crime. Julius Thomas told police that she was the mastermind and that he had been reluctantly convinced by her to commit the killing with her. At trial, she took the stand and testified to the jury that he had lied to police. In order to explain her own lies to the police about not knowing anything about the killing, she portrayed him as a brutal killer who had threatened her own life if she did not become his accomplice. She testified that he had acted on his own in killing the victim. She insisted to the jury that she was telling the truth, and that his

1

confession to police inculpating her was a lie, knowing very well that her accomplice could not take the stand to contradict her because he had committed suicide well before the trial.

Even though defendant had been forewarned by a tentative pretrial ruling that the scope of her testimony might render admissible her accomplice's confession, today the majority holds that regardless of the scope of defendant's testimony, the confession is inadmissible when the accomplice is deceased and unavailable to testify. Even though defendant *herself* proceeded to place the truthfulness of her accomplice's confession in dispute by assuring the jury that her own self-serving description of her accomplice's statements was the truth and that her accomplice's confession was false, the majority would still allow her to claim the protection of the confrontation clause.

The result is that defendant is allowed to have it both ways, by exonerating herself with her own testimony while enjoying protection from incriminating evidence on the same subject. As recognized by courts with similar exclusionary rules protecting a defendant from otherwise incriminating evidence, such rules are fairly applied as a " 'shield,' " not a " 'sword' " that can be used to cut off the prosecution's fair response to the evidence or argument of the defendant. (*United States v. Robinson* (1988) 485 U.S. 25, 32.) Under the majority's interpretation, defendants would be shielded from incrimination by an accomplice's confession to police while simultaneously being allowed to attack with impunity the credibility and character of that accomplice.

Because I do not believe the confrontation clause was intended to apply in this manner, I dissent.

## I. FACTS

In the early morning hours of October 28, 2011, Laverna Brown, a 66-year-old registered nurse and grandmother, was brutally killed at her home, assaulted

2

with a machete and nearly decapitated as she was preparing to leave on a trip to see her family. Brown rented a room in a home owned by Darcy Timm and lived with Timm and defendant Hopson, a nursing assistant, as housemates.

In the days before the killing, defendant had expressed a desire to move out of the house and into her own apartment. Defendant, however, had difficulty saving enough funds to pay an $800 deposit so she could move into her new apartment on October 29, the day after Brown was killed.

When Brown did not arrive as scheduled, her family reported her missing. The morning of the murder Timm noticed that a machete she kept in her garage was missing, as well as a large butcher knife she kept in a butcher block in her kitchen. Soon after, Timm discovered a blood-soaked blanket in a trash can outside next to her garage and saw blood and pieces of flesh on the ground. Timm called the police.

The police quickly identified defendant and her lover, Julius Thomas, as suspects. Defendant and Thomas had been intimate for several years while Thomas was living with and engaged to his fiancée, Veronica Franklin.

Approached by an officer at her place of work, defendant told the officer that she knew nothing about Brown's disappearance. Defendant claimed that, on the morning of the killing, she and Thomas had been together and that they went outside Timm's house between 2:30 a.m. to 4:30 a.m. She told the police that she had seen a "weird guy" with "scraggly, black hair underneath a hat," walking around the neighborhood that week.

Later, in an interview at the police station, defendant told police that she saw Brown packing for her trip, and then defendant went to sleep. Defendant claimed she woke up at around 2:00 a.m. to meet Thomas and that they went outside and spent time together at a local park. She again claimed to have seen a "weird" man walking around the neighborhood, but this time described him as

3

having scraggly blond hair. Defendant admitted to using a water hose outside that morning, but stated that she thought she was cleaning spilled cola, not blood.

The police used cell tower data for Thomas's cell phone to locate his whereabouts at the time of the murder, and to locate Brown's minivan, which had been abandoned in a parking lot. Brown's travel suitcase and nearly decapitated body were inside. The steering wheel of the van yielded biological evidence matching defendant's DNA profile, and Brown's, but not Thomas's. According to Timm, Brown had sometimes given defendant a ride to the store, but to Timm's knowledge, defendant had never driven the van herself.

The police arrested defendant and Thomas. A few days later, Thomas confessed to the killing, but claimed that defendant had masterminded the plan to assault and rob Brown. Thomas further cooperated with the police, led them to where he had disposed of clothing he wore during the crime, and helped the police recover one of the murder weapons, the machete.

Using cell phone data and purchase receipts, the police investigated the actions of defendant and Thomas in the hours before Brown's killing. At 5:53 p.m. on October 27, 2011, defendant and Thomas bought pepper spray and a pocket knife at a military surplus store. That evening at 7:12 p.m., defendant purchased at a department store the clothes Thomas wore during the killing, which took place just hours later.

Cell tower data for both defendant's and Thomas's cell phones showed that between approximately 7:00 p.m. on October 27 and 2:09 a.m. on October 28th, the two exchanged seven phone calls. The last two of these calls occurred on October 28 at 1:49 a.m. and 2:09 a.m. Cell tower data showed that during these two calls Thomas was driving in a westerly direction toward Timm's house. But defendant received both calls through a cell tower in the location of Timm's house

4

that was different from the cell tower used by Thomas's cell phone for the same calls.

For the next six weeks after their arrest, defendant and Thomas exchanged letters in jail. Defendant consistently wrote to Thomas that she loved him and missed him. In her last letters to Thomas, defendant again expressed her love for him, but asked him about his statements to police and said she wanted to end their relationship and would not write anymore. In his last letter to defendant, Thomas wrote, "Goodbye. Like you said, you won't write no more. That's fine. You did this, not me . . . . Don't waste my time no more. That's how you want to be. Well, have a nice life." Soon after, in December 2011, Thomas committed suicide in jail by hanging himself, leaving defendant to stand trial by herself.

Defendant testified in her defense and for the first time admitted her involvement in Brown's killing. Defendant, however, claimed she had not planned the homicide and that Thomas had acted on his own in killing Brown. Defendant testified that she only learned of his intentions just after 2:00 a.m. on October 28, 2011, when he called her and told her to come to the garage, where she discovered him with Brown's bloodied body. She claimed that Thomas demanded that she help him clean up the crime scene and threatened to kill defendant and her son if she did not help. Defendant told the jury that she feared Thomas and that, under his threats, she was compelled to help clean up the crime scene, dispose of Brown's body and incriminating evidence, and then lie to police.

In her testimony, as described in greater detail below, defendant recited numerous statements purportedly made by Thomas both before and after the killing. Defendant testified that Thomas had previously admitted to killing someone else and to other acts of past violence. Defendant claimed that Thomas had told her why he acted alone to kill Brown and how he had killed her. Defendant quoted threats Thomas had made against her and her son and how he

5

would carry out those threats. Defendant explained in detail how he had directed her to dispose of the body and other evidence.

In rebuttal, the prosecution called Detective Richard Wheeler to testify concerning Thomas's recorded confession to him. Thomas had told Wheeler how defendant had devised a plan for them to rob the victim, which involved defendant coaxing Brown into the garage where Thomas would rob and assault her. Thomas told Wheeler that defendant had purchased clothing for him to wear for the assault.

Thomas admitted that he hit Brown with the machete after defendant lured the victim into the garage. Thomas told the officer that defendant then kneeled over Brown and that he saw her holding a bloody kitchen knife. Thomas claimed that defendant told him that they had to get rid of Brown's body. According to Detective Wheeler, Thomas alleged that it was defendant's idea to clean up the blood using cola because she had seen a television show showing that cola dissolved blood.

Finally, Detective Wheeler described how Thomas had led police officers to various locations where he claimed he had disposed of evidence of the killing. This resulted in the recovery of the machete, but not the bloody clothing, which Thomas had disposed of in a dumpster that had been emptied in the interim.

The jury convicted defendant of first degree murder of Laverna Brown, also finding true the allegations that she killed Brown by means of lying in wait, and in the course of a robbery. Defendant was sentenced to life imprisonment without the possibility of parole.

## II. FACTUAL AND PROCEDURAL BACKGROUND CONCERNING THE ADMISSION OF THOMAS'S STATEMENTS

### A. Pretrial Evidentiary Rulings

The evidentiary issues raised in this case require a detailed description of the trial court's rulings, the arguments of counsel related to those rulings, and the rulings of the court admitting various out-of-court statements for the jury's consideration. The following is a description of these matters, in chronological order.

Before opening statements, the trial court made a series of evidentiary rulings. In response to a motion made by the prosecution for its admission, the trial court ruled that evidence of Thomas's assisting the police in recovering incriminating evidence would be admissible, provided there was no reference to defendant's involvement in disposing of the evidence. The trial court admonished the prosecutor to consult with his witnesses to ensure "that they understand that there will be no reference to any person other than Mr. Thomas in the simple act of taking the officers to the location, with no other amplification or elaboration."

The trial court also made a preliminary ruling concerning the admissibility of Thomas's police confession. By in limine motion, defense counsel had sought a ruling, based on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), to prohibit admission of Thomas's statements. At a hearing before opening statements, defense counsel explained that he wanted to "make sure" that if defendant testified, Thomas's statements to police would not be admitted. The prosecutor responded: "I think it depends on how she testifies. If I see that she's opened any doors, and if she does and if I want to go there, then I'll ask for a sidebar before we discuss that." The trial court then ruled that there would be no reference to Thomas's statements, "absent further order of the court following a

7

sidebar in the event that the prosecution believes that Ms. Hopson may have opened the door with her testimony."

## B. Defendant's Testimony on Direct Examination

On direct examination, defendant's first significant reference to an out-of-court statement by Thomas occurred when defense counsel asked her about Thomas's prior violent conduct: "Did he ever say anything to you where you believed — made you feel a little bit uncomfortable regarding some type of threat or violence that he had done in the past?" Defendant answered affirmatively, and the prosecutor lodged a hearsay objection to which defense counsel replied, "State of mind, your Honor." The trial court responded, "It will be admitted for the limited purpose, ladies and gentlemen, of establishing the witness's state of mind at the time the statement was overheard."[1]

Defendant, on direct examination, continued to testify, relating numerous and detailed statements that Thomas had purportedly made to her, all asserted to show why defendant feared Thomas and why she participated in helping him conceal the murder.

In her testimony, defendant claimed that Thomas had admitted to beating someone to death before and had made admissions about assaulting other persons. She also claimed that Thomas had "made allusions" that he would kill or hurt her if she ended their relationship.

---

[1]    Later, the record in this matter indicates that the prosecutor believed the trial court had admitted these statements under Evidence Code section 1215. But there is no section 1215 in the Evidence Code, so either the prosecutor misspoke or the transcript is in error. Likely, the intended reference was either to Evidence Code section 1250 or 1251. But neither section would be relevant because those sections cover hearsay exceptions concerning the *declarant's own statement revealing her own state of mind* and not a statement uttered by someone else and its effect on the state of mind and conduct of the *listener*.

Defendant claimed that Thomas had told her why he acted alone to kill Brown and how he had killed her. Thomas said he attacked Brown because he needed money, and he thought Brown was "an easy target" because she would have had spending cash on hand before leaving on her trip. According to defendant, Thomas said that Brown had recognized him "and that he had no choice but to kill her." Defendant testified that Thomas "said that she screamed and was making noise, and he didn't want anybody to hear her, so he sliced her throat." Defendant claimed Thomas "said that the machete was too dull" and Brown was still alive, "having sounds coming out of her throat," and Brown's "eyes were blinking." Defendant testified that, because she was still alive, Thomas said "he went into the kitchen and took the butcher knife and used [it] to finish what he started."

Defendant also quoted threats Thomas had made to her and about her son. Defendant said that Thomas claimed he had someone watching her son and that that person could harm her son if she did not cooperate in covering up evidence of the crime. Defendant further explained how Thomas had directed her to dispose of the body and other evidence and how she should lie to the police. Defendant testified that while Thomas was directing her to wipe away certain spots of blood, he stood over her while holding both the machete and the butcher knife and used a "very forceful" tone of voice with her.

Defendant further described statements that Thomas purportedly had made to her before the killing in order to explain why she had supplied the clothing and protection that Thomas had worn during the attack on Brown. Defendant claimed that Thomas, a bus driver, had asked her for hospital-style foot covers because Thomas had previously "said that he was tired of stepping on vomit and urine in his bus, and he asked me if I could get him some foot covers, so I did." Defendant testified that Thomas was wearing a hoodie sweat jacket and sweatpants, both size

9

3X, that "he told me to buy for" his sister and that "she was a big girl like he was" but "not as tall." Defendant also testified that she had previously given Thomas the blue nitrile surgical gloves he wore during the killing because he purportedly had said "he didn't like to touch the things that the customers would touch on the bus" because "they were nasty and he didn't want to get their germs."

Defendant further testified that, after their arrests for the killing, she was afraid that Thomas could still have her son killed because she had previously overheard him on the phone and that "he would talk in some kind of code that I didn't understand, and I felt that he could talk that way to whoever it was" who could kill her son.

## C. Defendant's Testimony on Cross-examination

During cross-examination, defendant admitted that Thomas had never been violent with her and that she had never seen him become violent with anyone else. The prosecutor also asked about Thomas's involvement in a motorcycle club, and defendant testified that Thomas said the club "did things that were against the law," and he alluded to violent acts.

The prosecutor repeatedly questioned why defendant had remained in a relationship with an admitted killer before Brown's death. Defendant replied that "not too long before" the Brown killing, in early October 2011, Thomas had threatened to kill her if defendant left the relationship.

Defendant admitted, however, that in a taped police interview she gave before she was aware that Thomas had confessed to police, she can be heard giggling and saying that "he's a little teddy bear," "he's my snugly teddy bear," in reference to Thomas. She also admitted describing Thomas in a very similar manner to another officer who questioned defendant at her place of work, soon

10

after the killing of Brown. She further admitted describing Thomas as "my honey" with a fellow nurse at the hospital after the killing.

The prosecutor asked a series of questions involving defendant's involvement in cleaning up the crime scene, and defendant repeatedly reiterated that she had done so under Thomas's threats and directions, including driving Brown's van to a location where they abandoned it. Defendant claimed that it was Thomas's idea to buy cola to help dissolve bloodstains at the crime scene and that he made her purchase cola at a convenience store.

The prosecutor then asked defendant about Thomas's cooperation with the police. The prosecution inquired whether defendant knew if Thomas had cooperated with the police and had led them to the location of the weapon used to kill the victim. Defendant acknowledged she knew that Thomas had assisted the police. The prosecutor then asked: "So we have this admitted killer actually showing the police officers evidence that will convict him of the crime?" Defendant replied: "Yes." She then further *volunteered*: "He also lied and said that I had nothing — something to do with it, and I did did [*sic*] not."[2] Defendant then claimed that the last time she saw Thomas was in court, and he threatened her by telling her that " 'snitches always die.' " The prosecutor later asked, "So even though [Thomas] had taken the police officers to the place where the murder weapon was, which completely implicates him, and then [Thomas] kills himself, leaving you to tell this story that it was all [Thomas's] doing, right?" Defendant responded: "No — yes, I'm telling the truth."

---

[2]    Compare with the description in the majority opinion: "The prosecutor had adverted to Thomas's November 1 police interview during the prosecution's case-in-chief, and he later cross-examined defendant regarding her knowledge of Thomas's confession. Defendant candidly admitted that she knew Thomas had confessed to detectives, and that he had accused her of planning the crime." (Maj. opn., *ante*, at p. 24, fn. 7.)

11

## D. The Trial Court's Ruling Admitting Thomas's Police Confession under Evidence Code Section 1202

In response to this testimony, during a break, the prosecutor asked the trial court to admit Thomas's statements to police to impeach the version of Thomas's statements that defendant had testified to in front of the jury. As authority, the prosecutor cited Evidence Code section 1202,[3] which permits, for impeachment purposes only, admission of a nontestifying declarant's statements that are inconsistent with other statements received in evidence by that same declarant.[4] (See *People v. Blacksher* (2011) 52 Cal.4th 769, 806 [§ 1202 "governs the impeachment of hearsay statements by a declarant who does not testify at trial"].)

Defense counsel objected and briefly stated the basis of his reasoning: "Just under *Crawford*, I believe that just because my client testifies to her state of mind as to what happened in the garage, what she heard the killer say, I don't think allows us to bring in his statements that he told police days later. That was my objection under *Crawford*."

This was the only objection the defense lodged concerning Thomas's police confession for the remainder of the trial. When the court overruled that objection, determining that the statements would be admitted for the "limited purpose" of impeachment under section 1202, defense counsel merely replied, "thank you."

---

[3]    All further statutory references are to the Evidence Code.

[4]    In relevant part, section 1202 states: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct."

12

When the court asked whether defense counsel wanted to place anything else on the record, defense counsel said, "No."

### E. Defendant's Testimony on Redirect Examination

After this ruling, on defendant's redirect examination, defense counsel asked her if she had read some of Thomas's statements to police. Defendant replied that she read them in a police report and she further explained that "[h]e accused me of planning it, of helping him, and I did not help him." Defense counsel then asked defendant: "Were his statements true that he told police?" Defendant replied, "No."

### F. The Admission of Thomas's Police Confession

As previously noted, the prosecution called Detective Richard Wheeler as a rebuttal witness to testify concerning Thomas's recorded confession to him, which Thomas made four days after the killing.

Detective Wheeler described Thomas as crying as "he said that the entire plan was created and brought about because [defendant] knew that her next-door roommate, [Brown], was going to be leaving cross-country on a trip and because she knew she had a good job she would have money" and that they needed money so they "put together a plan to rob her and that [defendant] would make it happen." The prosecutor asked the detective about Thomas's demeanor. Detective Wheeler noted that he himself was "not a little guy, but that Thomas was "much bigger than" he, and yet Thomas "was a complete mess sitting across from me and talking, crying, almost couldn't catch his breath, apologizing profusely for not being honest initially." Wheeler testified that Thomas said he wanted to tell the truth about what happened to "make it right" for the victim's family.

13

According to Detective Wheeler, Thomas claimed that on the night of the killing he had tried to convince defendant not to go through with it, but defendant insisted that Brown would be an easy target. Wheeler testified that Thomas explained how he and defendant had devised a plan together to rob the victim by having defendant coax Brown into the garage where Thomas would rob and assault her. Thomas also told the detective that defendant had purchased clothing for him to wear for the assault.

Thomas admitted to Detective Wheeler that he hit Brown with the machete. Thomas claimed defendant then kneeled over Brown and he saw her holding a bloody kitchen knife. Thomas alleged that it was defendant's plan to then dispose of Brown's body. Thomas said that he tried to convince defendant "to call the police" because it wasn't "the way that [he] expected it to go down." But defendant insisted on disposing of the body using Brown's van in order to make it appear that she actually left on her trip. According to Detective Wheeler, Thomas stated that defendant placed Brown's travel suitcase in the van and then defendant drove Brown's van, while Thomas followed in his own vehicle. Thomas claimed that defendant had directed the cleanup of the crime scene.

Detective Wheeler testified that Thomas recounted that he and defendant went to a fast food restaurant, after they had disposed of Brown's body. Thomas "said that [defendant] didn't seem to be bothered by how the entire incident had gone down and that she had no problem eating her food and that he was so sick to his stomach, he didn't order anything." According to Detective Wheeler, Thomas claimed it was defendant's idea to clean up the blood using cola because she had seen a television show showing that cola broke down blood.

Finally, Detective Wheeler described how Thomas led police officers to various locations where he claimed he had disposed of evidence of the killing.

On cross-examination, defense counsel asked Detective Wheeler whether it appeared that Thomas was being honest during his confession, and the detective replied that Thomas did appear to be speaking honestly. Defense counsel also repeatedly asked Wheeler whether Thomas said that the crimes were defendant's plan, and the detective replied affirmatively.

## G. Additional Rebuttal Evidence Concerning Thomas

As further rebuttal evidence, the prosecution called as a witness Thomas's fiancée, Veronica Franklin.

Franklin testified that in the five years she was with Thomas, she never heard him complain about the uncleanliness of the buses he drove such that he would want to wear foot covers while driving. Franklin testified that Thomas was "[l]aid back, real funny, [a] jokester; cool, calm and collected." Franklin explained that Thomas did belong to a motorcycle club, but that it was a faith-based Christian club known as the "Sons of Genesis." She explained that Thomas had never been violent with her and that he had never admitted to beating someone to death.

On cross-examination, Franklin admitted that she had been unaware of his relationship with defendant. Franklin testified that she trusted Thomas with her life and that she still thought he was an honest and nonviolent person despite what happened to Brown.

In addition, the prosecution introduced evidence that Thomas had no prior arrests or convictions.

## H. Closing Arguments

During closing arguments, the prosecutor contended that defendant was directly involved in Brown's killing. The prosecutor, without any objection by the defense, stated: "In this case, there is evidence that the defendant is the direct

15

perpetrator, that she had the bloody knife, the butcher knife in her hand while she was leaning over the body of Laverna Brown. You heard that through the statements of Julius Thomas that Detective Wheeler told us about."

Later, the prosecutor described the various elements of the crime, including lying in wait. In describing the state's lying-in-wait theory, the prosecutor, again without any objection by the defense, argued to the jury: "We heard from Detective Wheeler that Julius Thomas actually told Wheeler it was his plan to hide in the garage — it was her plan that he would hide in the garage, and she would create some secret plan to get Laverna out of her room and into the garage." The prosecutor noted that this was consistent with the fact that Brown had left her bedroom with the sewing machine set up to do some work, as well as the fact that she had not completed the items on her to-do list before leaving on her trip.

For the remainder of his initial closing arguments, the prosecutor made no other reference to Thomas's police confession.

Defense counsel began his closing arguments by declaring that the applicable laws were not "the biggest question in this case." Instead, defense counsel contended: "The biggest question is who is telling the truth." Defense counsel explained that if defendant was telling the truth, then she was not guilty.

Defense counsel acknowledged that Thomas "talked to police," but then assailed Thomas's trustworthiness. Defense counsel questioned whether Thomas could be trusted by contending that Thomas "does such a mind-job to women" by convincing them that he is honest and not violent. Defense counsel argued that Thomas "treats girls like dirt, like trash, disposable," contending that he can "step on you and then just urinate on you." He noted that he lied to his fiancée about his relationship with defendant. Counsel contended that defendant was a victim of this "same mind-job" by Thomas, and that it showed that Thomas was the actual mastermind, who pulled "the strings," and called "the shots."

16

Defense counsel then asked the jury: "Now the question is, is [Thomas] lying when he talked to police?" Counsel contended that Thomas was lying to police because the evidence showed he was in control of manipulating defendant. In this same context, defense counsel rhetorically asked the jury twice: "What's the truth?" Counsel then argued that even the prosecutor had partially acknowledged that Thomas was a liar because Thomas did not tell police that he and defendant had planned to kill the victim. Defense counsel contended that defendant and Franklin were both "weak-minded" persons whom Thomas manipulated to gain their love while also lying and threatening them. Defense counsel then recited defendant's testimony that Thomas had threatened that she would be "next," after the killing. Counsel further contended that Thomas treated women "like dirt" and that the reason Thomas killed himself was because "[h]e's guilty, and "[h]e's a liar."

In his rebuttal, the prosecutor argued that defendant had repeatedly lied on the stand. Later, the prosecution commented: "And if you notice the defense's closing argument, it was all about Julius and nothing about her." The prosecutor contended that Thomas's police confession revealed that Thomas had a breakdown and realized the seriousness of the matter and chose to tell the police the truth, explaining that it was defendant's plan to kill the victim and then leading police to evidence that would incriminate himself in the matter.

The prosecutor compared Thomas's credibility with defendant's credibility, contending that Thomas was more believable than defendant. "So what does [defendant] do? She had to take the stand and had to try and give an explanation for every one of the pieces of that evidence, and each time she did that, it was a lie." "But what did he do? He admitted his role. He came clean with the police and said, 'I'm sorry,' crying, 'Tell Laverna's family sorry.' 'Here, let me take you to the murder weapon. Let me take you to where the bloody clothing is.' That's

17

what shocked [defendant], because he gave it up, because he could not take the weight of what he had done and keep quiet."  The prosecutor then compared defendant's police interview with Detective Cobb with Thomas's confession to Detective Wheeler:  "You compare that person to the defendant's statements when she's talking to [the police], and you see right there the difference between the two.  You see a cold-blooded killer who can lie to the police, who can look Detective Cobb in the face and say nothing.  And then you have Julius Thomas who breaks down, tells the police the truth, understands the weight of the enormity of what he had done, explains it was the defendant's plan and takes the police to the evidence that would bury him."

For the remainder of his rebuttal, the prosecutor made no further reference to Thomas's police confession.

### III.  DEFENDANT WAIVED HER RIGHT OF CONFRONTATION

Defendant claims that the trial court's section 1202 ruling improperly admitted Thomas's police confession because his statements had no probative value under the circumstances unless the jury considered them for their truth, which is not the purpose of limited admissibility under section 1202.  She further assigns blame to the prosecutor, contending that he utilized Thomas's police confession for its truth during closing arguments.

Defendant made no such argument or objection concerning section 1202 before the trial court, and defendant lodged no objection to the prosecutor's closing arguments concerning Thomas's statements.  Setting aside these forfeitures, defendant overlooks the fact that she *herself* placed the truthfulness of Thomas's police confession in front of the jury well before the trial court's section 1202 ruling, before the police confession was introduced, and before closing arguments.  As I will explain, defendant's argument overlooks her own testimony imploring the jury to believe that Thomas's police confession was a lie.

18

Under these circumstances, I find defendant waived her right of confrontation concerning Thomas's police confession. By repeatedly attacking Thomas's police confession as a "lie," defendant created a credibility dispute between herself and Thomas in front of the jury. As a consequence of her actions and under the court's duty to protect its truth-seeking function, the jury was entitled to consider that confession to determine for itself whether defendant's claim was credible. [5]

### A. Defendant Herself Placed the Credibility of Thomas's Police Confession at Issue.

*1. The Circumstances Leading to the Trial Court's Admitting Thomas's Police Confession into Evidence on Rebuttal*

As described above, during the prosecution's cross-examination of defendant, the prosecutor asked defendant about Thomas's cooperation with the police. The prosecution inquired whether defendant knew if Thomas had cooperated with the police and defendant replied: "Yes." She then further volunteered: "He also lied and said that I had nothing — something to do with it, and I did did [*sic*] not." The prosecutor later asked, "So even though [Thomas] had taken the police officers to the place where the murder weapon was, which completely implicates him, and then [Thomas] kills himself, leaving you to tell this story that it was all [Thomas's] doing, right?" Defendant responded: "No — yes, I'm telling the truth."

---

**5**      Placing aside the applicability of the confrontation clause or whether defendant waived its protections concerning Thomas's police confession, under circumstances supporting trustworthiness, we have often upheld the admission of an accomplice's statements where they disserved the accomplice's penal interests. (*People v. Cortez* (2016) 63 Cal.4th 101, 127; *People v. Samuels* (2005) 36 Cal.4th 96, 120; *People v. Brown* (2003) 31 Cal.4th 518, 536; see § 1230.)

Following this exchange, the prosecutor asked the trial court to reconsider its tentative ruling and admit Thomas's police confession as rebuttal evidence. Defendant objected on *Crawford* grounds, but the court overruled that objection, determining that the statements would be admitted for the "limited purpose" of impeachment under section 1202. Although the trial court afforded the defense the opportunity to make any additional objections, defense counsel did not do so.

### 2. The Trial Court's Evidence Code Section 1202 Ruling Was Irrelevant in Light of Defendant's Testimony

Defendant contends that the trial court's section 1202 ruling was erroneous because the only purpose for which the prosecutor or the jury could have used Thomas's police confession was for the truth of those statements. But defendant did not raise this point before the trial court. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)[6] At this point, it was incumbent on the defense to prevent any alleged error by informing the court why the evidence could not be offered for the limited purpose contemplated by section 1202.[7] (Simons, Cal.

---

[6] We have previously explained the purposes of requiring an opposing party to object to potentially unfavorable evidence at trial: "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' [Citation.] 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.]" (*People v. Partida*, *supra*, 37 Cal.4th at p. 434.)

[7] Certainly, defendant, on direct examination, testified as to several statements that Thomas purportedly made to her that supported the nonhearsay

*(Footnote continued on next page.)*

20

Evidence Manual (2017 ed.) § 1:24, p. 32 ["Courts concerned about the jury's ability to adhere to the limiting instruction can utilize § 352 to exclude the evidence"], citing *People v. Green* (1980) 27 Cal.3d 1, 26; *Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 729, 732-733; see also *People v. Ross* (1979) 92 Cal.App.3d 391, 406-407 [crediting defendant's § 352 objection made in light of trial court's § 1202 ruling].)[8]

Instead of lodging any such objections, defendant actually did the opposite of what she now complains of on her appeal — she presented Thomas's police

---

*(Footnote continued from previous page.)*

purpose of explaining why she assisted him in concealing the murder. But also, the portions of her testimony on direct in which she relayed Thomas's description of why he allegedly targeted Brown, how he confronted her, and why and how he killed her, appear less relevant to explain her subsequent conduct and more relevant to explain Thomas's guilt, which is hearsay consistent with Thomas's declaration's against penal interest. (See § 1230, *ante*, fn. 5.) Arguably, this could make section 1202 relevant if Thomas's police confession could impeach Thomas's garage confession, as the Attorney General contended at oral argument. At any event, we need not need reach this issue, for the reasons I explain below.

[8] In a passing reference discussing the scope of section 1202, the majority states: "Thomas's confession could have impeached his credibility as a putative hearsay declarant even if — and perhaps especially if — his confession to detectives were false." (Maj. opn., *ante*, at p. 25, fn. 7.) To be clear, a statement admitted under section 1202 used to impeach a declarant's previously admitted hearsay statement is not admitted for its *truth* or *falsity*, but is strictly limited for impeachment purposes only. In considering conflicting statements of a hearsay declarant, "we are not asked to believe his prior statement as testimony, and we do not have to choose between the two (as we do choose in the case of ordinary contradictions by other witnesses). We simply set the two against each other, perceive that both cannot be correct, and immediately conclude that he has erred in one or the other, — but without determining which one." (3 Wigmore, Evidence (3d ed.) § 1018, p. 687; see also Simons, Cal. Evidence Manual (2017 ed.) § 2.18, p. 91 ["Prior inconsistent statements of a hearsay declarant are admissible only to impeach and not for the truth of the matter"].)

confession for its truthfulness. Soon after the section 1202 ruling, she again placed into question the credibility of Thomas's police confession on redirect examination when defense counsel asked defendant: "Were his statements true that he told police?" Defendant replied, "No."

However, placing forfeiture aside, and further assuming without deciding the trial court erred under section 1202, the trial court's ruling admitting Thomas's police confession was still correct because defendant herself had already placed the truth of Thomas's police confession at issue well before this challenged ruling.

We have recognized that a ruling will not be disturbed on appeal merely because it was given for a wrong reason, if the ruling would otherwise be correct " ' "upon any theory of the law applicable to the case," ' " and " ' "regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 976, quoting *D'Amico v. Board of Medical Examiners* (1974) 11 Cal. 3d 1, 19; see also *People v. Smithey* (1999) 20 Cal.4th 936, 972.) In the present matter, the trial court properly admitted Thomas's police confession because defendant had waived any prior limitations on its admission, a limitation which she now relies upon on appeal, by claiming at trial that his confession was substantively a lie.

Moreover, almost immediately following the trial court's section 1202 ruling, defendant, on her redirect testimony *again* went beyond the court's limited-purpose ruling and claimed that Thomas was not truthful to police.

Defendant speculates that her counsel elicited this testimony only in response to the court's section 1202 ruling. This contention is questionable for several reasons. First, this argument overlooks the fact that the court explicitly admitted the confession for impeachment and not for its truthfulness, citing section 1202. Second, and more importantly, defendant made no effort to object to the section 1202 ruling on the basis that the court could not so limit the use of the

22

evidence. Defendant makes no claim that any such objection would have been futile under the circumstances. (*People v. Valdez* (2012) 55 Cal.4th 82, 139 ["Nothing about the court's rulings on counsel's objections indicates it would have been futile to object to the same evidence under Evidence Code section 352"]; *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections"].)

Moreover, there is nothing in the record to illuminate defendant's assertion on appeal that her defense counsel had consciously made a tactical decision to forgo an objection that Thomas's police confession had no valid nonhearsay impeachment purpose and instead, address that confession for its truth, following the section 1202 ruling.

### 3. The Record Demonstrates that the Prosecution Was Not Responsible for Addressing Thomas's Police Confession for Its Truth

The majority contends: "the record belies any claim that the prosecution used Thomas's confession for the limited nonhearsay purpose of impeaching the statements defendant had attributed to Thomas in her testimony. The prosecution instead relied on Thomas's confession to contradict defendant's testimony by establishing a different account of the events surrounding the crime, which the prosecution expressly and repeatedly invited the jury to consider for its truth." (Maj. opn., *ante*, at p. 15.)

In support of this contention, the majority and the defendant both focus on Detective Wheeler's testimony in the *rebuttal* phase of the trial and the prosecutor's references to Thomas's police confession in closing arguments. (Maj. opn., *ante*, at pp. 12-15.) Obviously, however, defense counsel's redirect examination took place well before Detective Wheeler's rebuttal testimony and before closing arguments. And in that redirect, defendant expressly commented

on the truthfulness of Thomas's police confession, despite the trial court's limited purpose ruling. Therefore, defendant and her defense counsel's decision to address Thomas's police confession for its truth cannot be attributed to any relevant prosecution conduct.

The majority further contends, in an argument not raised by defendant, that the fact that defendant characterized Thomas's police confession as a lie did not "misrepresent[] the content of Thomas's confession to her advantage . . ." (Maj. opn., *ante*, at p. 24, fn. 7.)

I disagree. The record reflects that defendant's characterization did in fact work to her advantage. By expressly volunteering that not only did Thomas purportedly lie to police, she further asserted, in juxtaposition, that she was "telling the truth." Given this circumstance, combined with the trial court's earlier pretrial ruling tentatively excluding Thomas's police confession, it is hard to accept the majority's conclusion that defendant enjoyed no advantage in telling the jury that she was honest and her accomplice was a liar, hoping that the jury would never have the opportunity to hear her accomplice's statements that would effectively impeach her own claims of honesty.

The majority additionally argues that pointing out these circumstances of the record is effectively conducting "the parties' litigation for them," and that this is an argument the Attorney General himself has not raised. (Maj. opn., *ante*, at p. 24, fn. 7.) But this is a non-sequitur, because it is *defendant's* claim on appeal that the prosecutor used Thomas's police confession for its truth, and it is her burden to prove the existence of such error. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 ["Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error"].) The fact that the Attorney General does not raise this claim is, therefore, irrelevant. I merely point

24

out these circumstances to rebut defendant's claim that the record supports her claim of error, when she should arguably be estopped from doing so by her own conduct.

"On appeal, we assume a judgment is correct and the defendant bears the burden of demonstrating otherwise." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1097, fn. 11, citing *People v. Garza* (2005) 35 Cal.4th 866, 881; *People v. Cardenas* (2015) 239 Cal.App.4th 220, 227.) Under these circumstances, defendant fails to show, on this record, that the trial court erred in admitting Thomas's police confession. (See *People v. Montes* (2014) 58 Cal.4th 809, 882 ["We reject defendant's contentions as unsupported by the record"]; *People v. Lancaster* (2007) 41 Cal.4th 50, 101 ["This claim is not supported by the record"].)

### 4. Additional Circumstances Establishing Defendant's Waiver of Limitations on the Use of Thomas's Police Confession

The defense continued to directly address the truthfulness of Thomas's police confession in the prosecution's rebuttal. After the prosecution presented Detective Wheeler's description of Thomas's police confession, defense counsel asked Wheeler whether it appeared that Thomas was being honest during his confession, and the detective replied that Thomas did appear to be speaking honestly.[9]

If there can be any further doubt that defendant wanted the jury to consider Thomas's police confession for its truthfulness, consider defense counsel's closing arguments. As described above, defense counsel began his closing argument by declaring that "[t]he biggest question [in this case] is who is telling the truth."

---

[9] In contrast, the prosecutor did not ask Detective Wheeler a similar question and, instead, only asked the detective about Thomas's demeanor.

25

Defense counsel spent much of his closing statement contending that Thomas had lied to police because he was a skilled manipulator, and outright labeled Thomas "a liar."

In further assigning blame to the prosecution for the admission of Thomas's police confession for its truth, the majority references the prosecution's closing arguments. But the bulk of defendant's and the majority's complained-of references are to the prosecutor's *rebuttal* closing arguments. Given that the core of defense counsel's closing statement was a comparison of defendant's credibility with Thomas's, contending that Thomas's character established that he lied to police, it is unsurprising that the prosecutor directly addressed the truthfulness of Thomas's police confession in his rebuttal.

Defendant does identify two references in the prosecutor's *initial* closing arguments, in which she contends the prosecutor improperly referred to Thomas's police confession for its truth.[10] To the extent that both of these comments can be deemed as referencing Thomas's police confession for its truth, defendant has forfeited any allegedly impropriety by failing to object on this ground. (*People v. Tafoya* (2007) 42 Cal.4th 147, 176 ["a claim of prosecutorial misconduct is not reviewable on appeal unless the defendant makes a timely objection and asks the trial court to admonish the jury to disregard the prosecutor's improper remarks"].)

In any event, given that defendant herself had placed into question the truthfulness of Thomas's police confession well before that confession was

[10] The first is when the prosecutor stated, "there is evidence that the defendant is the direct perpetrator, that she had the bloody knife, the butcher knife in her hand while she was leaning over the body of Laverna Brown." The second is when the prosecutor stated, "We heard from Detective Wheeler that Julius Thomas actually told Detective Wheeler . . . it was her plan that he would hide in the garage, and she would create some secret plan to get Laverna out of her room and into the garage."

26

admitted and well before closing arguments, it became fair game for the prosecution to comment on the truth of that confession, especially when it appeared likely that the defense would argue the truth of Thomas's police confession in its own closing arguments. (*People v. Bemore* (2000) 22 Cal.4th 809, 846 [recognizing that "[m]isconduct claims also have been rejected where the prosecutor anticipates the flaws likely to appear in counsel's closing argument based on evidence that was introduced"], citing *People v. Thompson* (1998) 45 Cal.3d 86, 113; see also *Bemore*, at p. 846 ["[A] prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account"].) Defendant in fact did so in her counsel's closing arguments.

## B. The Scope of a Defendant's Testimony Can Result in the Waiver of Constitutional Rights and Permit the Admission of Evidence Otherwise Subject to Exclusion

### 1. Similar Waivers of Other Constitutional Rights

In other contexts, the high court has repeatedly recognized that a defendant's choice to take the stand, as well as the scope of a defendant's testimony, may result in a waiver of constitutional rights.

When a defendant elects to testify, any Fifth Amendment right against self-incrimination is deemed waived, and "the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." (*People v. Cooper* (1991) 53 Cal.3d 771, 822; see *People v. Wagner* (1975) 13 Cal.3d 612, 618; *People v. Saddler* (1979) 24 Cal.3d 671, 679.)

Moreover, given that the truth-seeking function of cross-examination applies as much to a defendant who elects to testify as to any other testifying witness, the high court has recognized that a defendant can waive the protection of

an exclusionary rule by taking the witness stand and offering testimony that conflicts with evidence that would otherwise be inadmissible under an exclusionary rule.

In *Walder v. United States* (1954) 347 U.S. 62 (*Walder*), the high court permitted physical evidence, earlier excluded on Fourth Amendment grounds, to be used for impeachment purposes where the defendant testified, inconsistently with the evidence seized, that he had never purchased, sold or possessed any narcotics.  The high court concluded that the evidence had been properly admitted: "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained.  It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." (*Id*. at p. 65.)  The high court explained that a contrary conclusion "would be a perversion of the Fourth Amendment" because "there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." (*Ibid*.)

In *Harris v. New York* (1971) 401 U.S. 222, the high court permitted the admission of a defendant's statements to police, although they were taken in violation of *Miranda v. Arizona* (1966) 384 U.S. 436, because his testimony was inconsistent with his statements to police.  After describing its prior decision in *Walder*, the court observed, "We are not persuaded that there is a difference in principle that warrants a result different from that reached by the Court in *Walder*." (*Harris*, *supra*, 401 U.S. at p. 225; see *Walder*, *supra*, 347 U.S. 62.)  In highlighting the necessity of allowing the prosecution to admit the defendant's statements to police, despite having been obtained in violation of *Miranda*, the court explained, "Having voluntarily taken the stand, petitioner was under an

28

obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." (*Harris*, at p. 225; see also *United States v. Robinson*, *supra*, 485 U.S. 25, 32 [defense counsel's closing argument that the state had not given defendant an opportunity to explain his actions waived the Fifth Amendment protection afforded by *Griffin v. California* (1965) 380 U. S. 609, permitting prosecutor to comment on defendant's failure to testify].)

### 2. *Waiver under the Confrontation Clause*

As the high court has recognized, "[t]he right to confrontation may, of course, be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314, fn. 3.) Similarly, in *People v. Stevens* (2007) 41 Cal.4th 182, 199, we concluded that the defendant had waived his initial confrontation clause objection concerning the admission of a codefendant's statements to police because his defense counsel eventually expressed satisfaction with a redacted version of the statements. (*Id.* at p. 199.)

If the confrontation clause can be waived by the simple failure to object or can be waived by defense counsel, then it certainly may also be waived when the defendant herself begins to explicitly question the truthfulness of the very evidence that the confrontation clause would exclude. That defendant must have known her testimony would constitute a waiver is evidenced by the fact that defendant was warned at the beginning of trial that her testimony, if not sufficiently restrained, could result in the admission of Thomas's police confession.

29

### 3. The Scope of Defendant's Testimony Waived Her Right to Confront Thomas

Defendant fails to provide a persuasive argument that she has not waived protection under the exclusionary rule of the Sixth Amendment's confrontation clause in the circumstance of this case. As the testifying defendants did in *Walder* and *Harris*, she offered testimony that conflicted with evidence that would otherwise be inadmissible. Moreover, defendant went even further and told the jury that Thomas was a liar and that her version was the truth.

As the high court has observed: "A defendant may decide not to take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics. Once a defendant decides to testify, '[the] interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.' " (*Jenkins v. Anderson* (1980) 447 U.S. 231, 238, quoting *Brown v. United States* (1958) 356 U.S. 148, 156.)

Exclusionary rules protecting a defendant from otherwise incriminating evidence are important, if not essential, to the protection of both a defendant's rights and the rights of society as a whole against oppressive state conduct. But such exclusionary rules cannot be manipulated so as to thwart the truth-seeking function of the court. "The right to cross-examination, protected by the Confrontation Clause, thus is essentially a 'functional' right designed to promote reliability in the truth-finding functions of a criminal trial." (*Kentucky v. Stincer* (1987) 482 U.S. 730, 737.)

Defendant in this matter used Thomas's purported past admissions of violence, his confession in the garage, and his threats of harm to her own advantage to establish, as her counsel argued in closing arguments, that Thomas was a person of capable of killing a grandmother who could treat women "like

30

dirt" and could "step on you and then just urinate on you." In furtherance of that depiction, defendant in this matter sought to turn her accomplice's police confession into a sword for her own advantage, using it to further malign Thomas's character as a liar and establish herself as a truthful victim, and yet she also sought to "provide [herself] with a shield against contradiction of [her] untruths" by relying on the confrontation clause to prevent the jury from hearing the same declarant's confession to police. (*Walder*, *supra*, 347 U.S. at p. 65.) This inconsistent dual use only flouts the truth-seeking function contemplated under the confrontation clause.[11]

Because defendant has waived her confrontation clause claim, we need not decide whether there exists, distinct from a simple waiver, a separate confrontation clause exception to the admission of *Crawford*-related hearsay where the defense has "opened the door" to such testimonial hearsay by presenting evidence suggesting an incomplete, misleading, or selective portrayal of otherwise inadmissible evidence under the shield of the confrontation clause. (*People v. Reid* (2012) 19 N.Y.3d 382, 389.) Nor need we decide, as the majority does, that assuming such an exception exists, defendant did not open that door. Courts generally avoid reach constitutional questions unless absolutely required to do so to dispose of the issues before them. (*People v. Leonard* (1983) 34 Cal.3d 183, 187; *DeLancie v. Superior Court* (1982) 31 Cal.3d 865, 877.)

---

[11]    The majority dismisses this ground for affirming the judgment because the Attorney General has raised no such argument. (Maj. opn., *ante*, at p. 24, fn. 7.) But the issue I raise is that defendant herself chose to address her accomplice's police confession for its truth and thereby waived any confrontation clause claim. The Attorney General certainly did argue such a waiver, but did so under the so-called opening the door exception. I am merely contending that the waiver that occurred here was not so complicated so as to need to resort to that theory, even assuming that such an exception exists under the confrontation clause.

Finally, we also need not reach this constitutional question, because, as discussed below, any error was harmless.

## IV. ANY ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT

Even assuming the admission of Thomas's police confession created an error of constitutional magnitude, I find that any asserted confrontation error was harmless beyond a reasonable doubt. (*People v. Capistrano* (2014) 59 Cal.4th 830, 874 [reviewing error under the confrontation clause under the harmless beyond a reasonable doubt standard].) A brief review of the facts and defendant's testimony reveals that any error was harmless beyond a reasonable doubt in that the verdict would have been the same without the challenged evidence.

The prosecution established and argued that, just before the killing, defendant had difficulty securing enough funds so she could move out of the room she had been renting in a home she shared with her landlord and the victim and live in her own apartment. On the day before Brown's killing, defendant's bank records showed she had less than $35 total in her accounts, yet defendant told her prospective new landlord that same day that she thought she would have the money to pay an $800 deposit so she could move on October 29, the day after Brown was killed.

According to defendant's version of events, she had no idea that Thomas intended to rob and kill her roommate Brown. Defendant testified that she learned of his intentions only after 2:00 a.m. on October 28, 2011, when he called her and told her to come to the garage, where she discovered him with Brown's bloodied body. But this story conflicts directly with the crime analyst's testimony concerning cell tower data, showing that at 2:09 a.m., Thomas's phone was traveling "east-west out towards the La Sierra area" whereas defendant's phone at that time was "in the vicinity of the address of 11530 Gedney Way," where the killing occurred. Moreover, a stipulation read to the jury explained: "Generally,

32

the cell tower that is closest to the cell phone is utilized to connect the call." For the 2:09 a.m. phone call, defendant's and Thomas's phones used different cell towers. According to the map in evidence, Thomas's cell tower was about a mile further away from the house than defendant's cell tower, which was very close to her residence.

In addition, there were numerous circumstances indicating that Thomas must have had defendant's cooperation before the killing in order to ambush and kill Brown. The evidence showed that Brown had an erratic work schedule, comprised of 12-hour shifts. Brown did not park her van in the garage, where she was killed, but generally parked it at the side of the house. Defendant acknowledged that the house residents normally kept locked the side door that was used to gain entrance into the garage from where Brown normally parked her van. Defendant admitted that she knew, in advance of the night of the homicide, Brown's work schedule and her flight information for the following morning. Defendant also admitted that she told Thomas that her landlord owned a machete, but she denied ever telling Thomas where it was kept.

Given these circumstances, defendant's claim that she was not involved in planning the killing is not credible. In order for Thomas to have ambushed Brown in the garage, he would have to have known Brown's work schedule that night, the side door would have to have been unlocked, he would have to have known where the machete was so he could arm himself for the ambush, and he would have to have expected that Brown, for some reason, would be inside the garage at 2:00 a.m., instead of being asleep in her room. Furthermore, Thomas would to have been unconcerned about the risk that he would encounter the other residents of the household, defendant and her landlord, Timm.

Instead, as the prosecution contended, defendant must have told Thomas of Brown's work schedule that night and defendant must have lured Brown into the

33

garage. This was consistent with the state of Brown's room, which indicated Brown had been interrupted from using her sewing machine and had left behind an incomplete to-do list in preparing for her trip.

In a taped police interview given before defendant learned Thomas had confessed to the police, in referring to Thomas, defendant can be heard saying, "Oh [giggle] he's a little teddy bear," and "he's my snugly teddy bear."

Moreover, although she tried to provide innocent explanations for doing so, defendant also admitted that she had bought and provided Thomas with the clothes, surgical gloves, and surgical booties that he wore during the killing and the subsequent cleanup. Thomas's fiancée rebutted defendant's claim that Thomas wore surgical booties or gloves because he believed the buses he drove were unsanitary.

In addition, defendant made various purchases in the hours before Brown's murder and her explanations for those purchases were not convincing. A vendor at a military surplus store identified defendant and Thomas as persons in his store who bought pepper spray and a pocket knife on October 27, 2011, the evening before the homicide. He also identified a handwritten receipt he had written for that transaction on that same date. In her testimony, defendant claimed the vendor lied and that she was by herself and made the purchase of $76.44, despite her admitted financial problems at that time in struggling to gather enough money for a deposit on an apartment rental. She provided no explanation concerning why the vendor would be lying.

Pursuant to stipulation, it was established that less than 80 minutes later, defendant purchased the clothes Thomas wore for the killing that occurred just hours after that. Defendant claimed that Thomas had tricked her into buying this triple-large clothing for his sister. But again, she made this purchase even though defendant had almost no money in her bank accounts.

34

Furthermore, according to defendant, Thomas originally wanted only to rob Brown, but to his "surprise" Brown recognized him, so he decided to kill her. This testimony was not credible because, as the prosecutor argued, defendant also admitted that Brown and Thomas had met before. Furthermore, wearing surgical booties is planning activity more consistent with trying to avoid leaving bloody footprints after a killing with sharp instrument than planning a bloodless robbery.

In her statements to police, defendant claimed that on the morning after the killing, she had used a hose to wash off cola she had spilled at the side of the house. When the police told her they found significant traces of blood at that spot, she appeared surprised, and reiterated that she thought she was cleaning up cola, not blood. According to the interviewing officer, she then started to pause in her responses and seemed to become more quiet, indicating a consciousness of guilt.

As additional evidence to support alleged fear of Thomas, defendant testified that Thomas said he was involved in a motorcycle club "and sometimes they did things that were shady." But the prosecution rebutted that assertion through defendant's fiancée, who explained that Thomas did belong to a motorcycle club, but that it was a faith-based Christian club known as the Sons of Genesis. Franklin further explained that the club's emblem depicted a cross with wings, and that Thomas wore a jacket with that emblem whenever he participated in the club's activities.

Defendant also admitted that she did not report Thomas's alleged threats to her until 14 or 15 months after his suicide because she thought that Thomas could carry out his threats against her and her son through a third party. But defendant provided no reason why her testimony at trial posed no similar risk to her or her son.

Finally, it is also peculiar and doubtful that Thomas would risk severely upsetting defendant, his mistress of many years, by killing her roommate, which,

35

under normal circumstances, would obviously shock her and jeopardize both his relationship with her and with his live-in fiancée. Under these circumstances, it is not credible that Thomas acted alone without planned assistance from defendant.

The far more logical, if not unavoidable, explanation was that defendant and Thomas colluded together to have defendant lure Brown to the garage, where Thomas could lie in wait with the machete (given to him by defendant) to assault Brown, and where it would be easier to clean blood evidence.

Consequently, even without the admission of Thomas's police confession, whether admitted for its truth or not, the jury would have found that defendant's testimony on direct examination did not survive the test of cross-examination. (*People v. Vega* (2015) 236 Cal.App.4th 484, 497 ["when a defendant does testify, all bets are off" because the defendant waives Fifth Amend. privileges "and is subject to cross-examination just as any other witness is"], citing *People v. Saddler*, *supra*, 24 Cal.3d 671, 679; *People v. Wagner* (1975) 13 Cal.3d 612, 618; and *People v. Zerillo* (1950) 36 Cal.2d 222, 227-229.) Rather, defendant's guilt was established beyond a reasonable doubt. As a result, I would find any error harmless beyond a reasonable doubt.

On these grounds, I dissent.

**CANTIL-SAKAUYE, C. J.**


**I CONCUR**:

**WERDEGAR, J.**

36

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Hopson

_____

**Unpublished Opinion** XXX NP opn. filed 6/24/15 – 4th Dist., Div.1
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S228193
**Date Filed:** July 3, 2017

_____

**Court:** Superior
**County:** Riverside
**Judge:** Jeffrey J. Prevost

_____

**Counsel:**

Gordon S. Brownell, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting, Deputy State Solicitor General, Andrew S. Mestman, Sean M. Rodriquez, Michael Pulos and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gordon S. Brownell
1241 Adams Street, #1139
St. Helena, CA  94574
(707) 942-4565

Seth M. Friedman
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-3199