Filed 7/2/24  P. v. Blinston CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C096769 |
| Plaintiff and Respondent, | (Super. Ct. No. 21CF02562) |
| v. | |
| RYAN SCOTT BLINSTON, | |
| Defendant and Appellant. | |

Over a three-week span of time, defendant Ryan Scott Blinston murdered three people, attempted to murder two others, and set fire to the vehicle in which one of the victims lived.  Appealing from the judgment against him, defendant contends that insufficient evidence supports his convictions of two of the murders and one of the attempts, the trial court erred by consolidating all counts, and the court erred by not giving a limiting instruction.  Defendant asserts his trial counsel rendered ineffective assistance to the extent counsel did not object to the errors.

1

We affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

A. <u>Prosecution's</u> <u>case</u>

 1. <u>May 23, 2020 – Homer and Loreen S.</u>

Ninety-One-year-old Homer S. and his 88-year old wife, Loreen S., lived in Los Molinos next door to their nephew, Frank S.  Homer hired North Valley Tree Service to remove two large trees on his property.  The company sent two crews to the property on May 18, 2020, to perform the work.  Defendant was a member of one of the crews.  North Valley had employed him for approximately four months.  Defendant's crew included Luis N., the crew leader, and John H.

At Homer and Loreen's house on May 18, defendant and John H. spent most of the day "running ropes," bringing down wood and dragging brush to the driveway.  At one point, defendant spoke with Homer.  The crew was on site from approximately 8:00 a.m. until 3:00 p.m.

Five days later, on May 23, 2020, at approximately 7:15 a.m., Loreen stopped by a neighbor's house about half a block away to drop off a bag of oranges.  She stayed at the neighbor's house for about 10 minutes and left for home.

That morning, Frank was playing with his dog after waking up when the animal growled and looked at the back door.  Frank looked out of the door and saw Homer coming onto the back porch.  Homer was in his underwear and covered in blood from head to toe.  He was bleeding from his neck.  Frank asked him if he had fallen down.  Homer said a masked man came in, stabbed him in the neck, and asked where the money was.  Frank asked where Loreen was.  Homer said she was dead.  He had never seen anyone bleed out so fast.  Frank grabbed a towel, put it on Homer's neck, and had Homer sit down.  He called 911.

Responding to a call from dispatch at 7:46 a.m. that morning, a deputy from the Tehama County Sheriff's Department examined Homer in Franks' bathroom. Homer was in blood-soaked underwear and holding a towel compress against his neck. Removing the towel, the deputy saw a large laceration on the left hand side of Homer's neck just above his clavicle that was actively bleeding. The deputy maintained pressure on the wound until medical personnel arrived.

A sheriff's detective arrived at Josephine street, the location of the crimes, just before 9:00 a.m. Following a blood trail from Frank's house to inside Homer's house, the detective saw Loreen, deceased, lying in a pool of blood in the master bedroom's doorway. A large amount of blood covered her face and clothes. Loreen had been stabbed in the neck likely while in the doorway. A large amount of blood on the bed indicated where Homer had been attacked.

The detective found fresh pry marks on the back door of the residence, consistent with someone forcing the door open. There was no indication anything had been taken from the residence. Several guns were still inside an unsecured gun safe in the master bedroom.

Days later, Frank noticed that a wire fence on Homer and Loreen's property had been smashed down and was leaning towards their house. The fence was swabbed for DNA, but the results were inconclusive.

An autopsy revealed that Loreen was stabbed at the base of her neck above her clavicle on her left side with a knife. She died from the stab wound, as the knife completely incised her jugular vein, causing her to bleed out. The wound was not self-inflicted.

Homer was stabbed on the left side of his neck. The knife lacerated multiple blood vessels and went down to the spinal canal and the vertebrae. Homer was "nigh unto death" when he arrived at the hospital from loss of blood, and he required immediate surgery.

3

At the time of the crimes, defendant lived in Oroville, approximately 46 miles from Homer and Loreen's home in Los Molinos. Cell phone records revealed that on the day before the crimes, May 22, 2020, defendant's cell phone was in the vicinity of Homer and Loreen's residence from approximately 8:22 p.m. to 9:33 p.m., and then it returned to the vicinity of defendant's home.

On the morning of the crimes, May 23, defendant's cell phone left the vicinity of his residence at approximately 5:19 a.m. and moved north. The phone arrived in the Chico area at 6:09 a.m., and then it stopped connecting to the network or was turned off. The phone was inactive from 6:19 a.m. to 9:34 a.m. Since the phone was in a good service area, it is more likely that the phone was turned off during that time. When the phone reestablished connection at 9:34 a.m., it was in Oroville.

On the day of the crimes, a residential video camera along Highway 99 in Chico, approximately 16 miles away from Homer and Loreen's residence, captured a vehicle at 6:24 a.m. traveling north toward Los Molinos. At 7:51 a.m., it recorded a car traveling south. The videos were played to the jury, but the record does not describe their contents.

2. June 4, 2020 – Sandra George

Eight-two-year-old Sandra George lived in Oroville. She retained North Valley Tree Service to trim her trees. Luis N.'s crew, with defendant and John H., performed the work on June 4, 2020. Luis N. and John H. arrived at the site at approximately 8:00 or 8:30 a.m. Defendant arrived late in his blue Pontiac.

The crew had lunch on George's front porch. Defendant went to his car for a couple of minutes. They finished the job around 2:00 or 2:30 p.m. As Luis N. was ready to leave, defendant told him he had forgotten the tree sign they had put out to warn people they were working. Defendant grabbed the sign and put it in Luis N.'s "boom," then Luis N. left for the shop.

4

The next day, June 5, 2020, George's friend, Donald O., went to George's home at approximately 5:00 p.m. to see how the tree trimming went. After knocking and ringing the bell several times with no answer, he returned to a friend's home. Minutes later, he returned to George's home and rang and knocked on the door again. He noticed George's newspaper was still in the box, which was unusual because she would retrieve her newspaper in the morning. She usually kept her door locked, but Donald discovered it was unlocked. He opened the door and saw George lying on the stairs, covered in blood. He called the police.

Oroville police officers arrived at George's home at approximately 5:30 p.m. Walking inside, they saw George lying on the staircase, along with blood on the ground and the wall. She had a wound on the right side of her neck. There was no evidence of forced entry into her home, nor did there appear to be any theft. Police located George's purse which contained her wallet, her drivers' license, a bank card, checks, and cash.

An autopsy revealed that George's body had 13 sharp force injuries—12 incise wounds and one stab wound. An incise wound is a sharp force injury that is longer than it is deep. A stab wound is the opposite. A stab wound in her left shoulder was 11 centimeters deep and was sustained before George died. The 11 incise wounds were to her right neck, head, ear, both hands, and right knee, all suffered before George died. The incise wound to her neck was four inches long. George died from the multiple sharp force injuries.

A neighbor's surveillance camera captured two North Valley Tree Service trucks driving towards George's home at 7:39 a.m. on June 4, 2020. At 7:52 a.m., a blue Pontiac arrived at the scene. The video depicted the two trucks and the Pontiac leave the area at approximately 2:00 p.m. that day. At approximately 2:40 p.m., the blue Pontiac returned to the scene. It left the area at 2:50 p.m. Its license plate was visible in the video and the car was defendant's Pontiac.

5

Defendant's cell phone records indicated that on June 4, 2020, defendant's cell phone traveled from the vicinity of his home towards the vicinity of George's home, back towards his home and back again towards George's home, and then to the vicinity of his mother's home. The phone first left the vicinity of George's home at approximately 1:59 p.m. It returned to the vicinity of George's home at approximately 2:30 p.m., and left that area the second time shortly after 2:50 p.m.

3.     June 6, 2020 – Vicky Cline

In June of 2020, 57-year-old Vicky Cline lived in her Chrysler Pacifica minivan. Occasionally, Cline would park her van in Oroville outside the Robinson Street home of Gina B. and her renter, Rex C. Gina B. did not know Cline, but Rex C. would let Cline come into the house. Defendant would also visit Gina B.'s home and stay over occasionally.

On the morning of June 6, 2020, Cline was in her van parked in front of Gina B.'s house. She sent a text message to Rex C. asking if she could have a Pepsi. Rex C. said yes, and he brought a Pepsi to her. He noticed defendant was sitting "in the car behind the passenger front seat, facing the back of the vehicle, with the door open, and one leg out."

Shortly after delivering the Pepsi, Rex C. received another text message from Cline. She asked, " 'Will you please, please tell Ryan [defendant] I'm not going to drive him where he needs to go?' " Rex C. responded that defendant had his own vehicle.

Later that evening, Rex C. saw defendant on the back porch. Defendant was pouring white gas—a highly flammable fuel similar to kerosene—from a gas can into a tall plastic AMPM cup. Rex C. could smell the gas when he opened the door, and he was approximately 20 feet away from defendant. Defendant was wearing a red and white hoodie, sunglasses, a ball cap, gloves, and a painter's mask.

6

At approximately 8:15 p.m., Rex C. and Gina B. heard an explosion. Rex C. ran into the front yard. Cline's van was engulfed in flames. Defendant was in the front yard, and he and Rex C. almost collided. Defendant was not wearing the hoodie, sunglasses, hat, or gloves. He was wearing only long pants and a white T-shirt. The next morning, Rex C. found an AMPM cup melted to the curb and next to the van.

An officer from Cal Fire determined the fire erupted inside the van in its second passenger compartment. That compartment had far more damage than the van's other interior areas. The rear passenger side door was open when the fire occurred. The engine compartment sustained little to no damage. The van's interior smelled heavily of gasoline.

The opened rear door concerned the officer. In his experience, if someone poured flammable liquid into the vehicle and started it on fire, the person would not take the time to close the door, nor most likely would the person have been able to close it with the expulsion of flames. The officer ultimately determined the fire was the result of arson by use of an incendiary flammable liquid, such as gasoline or kerosene.

The next day, June 7, 2020, defendant's phone was used to search on Google " 'how long does it take to grow eyelashes back,' " and " 'do[] burnt eyelashes grow back.' "

On June 9, 2020, several employees at North Valley Tree Service noticed a burn on defendant's hand. It was a severe burn with a large blister. His hair appeared to be singed, and he no longer wore a beard. The office manager offered defendant burn cream, but he said he did not need it. Asked what happened, defendant said he was burned in a barbeque accident. That day, defendant's phone was used to search on Google " 'how to treat a burn.' "

Also on June 9, 2020, a police detective interviewed North Valley Tree Service employees regarding George's murder, including defendant. Defendant's hair was short, and he had no eyebrows. The detective asked defendant if he went back to George's

7

house after leaving the job site. Defendant said he did not. Defendant did not return to work at North Valley Tree Service after the day of the interview.

On June 9, 2020, Gina B. also noticed that defendant had burns on his face and his eyebrows "were gone." Defendant told her he was going to "go out on the road." Gina B. had also discovered that a four-foot ice chest she regularly kept by her back door stairs was missing.

On June 10, 2020, Cline's daughter, Samantha, visited Gina B.'s residence to see her mother's burned van. She saw a few people standing on the porch, including defendant. He had a bandage wrapped around his left hand. She called out to defendant, "Are you Ryan?" Defendant responded, "Who's asking?" Samantha replied, "Vick[y]'s daughter." She asked defendant why he was hanging out with her mother, given their 20-year age difference. Hearing that, defendant ran off the porch, jumped over a fence, and fled in a black car. Defendant drove a black Chevrolet Tahoe in addition to the Pontiac. Samantha followed him briefly and called the police.

Fishermen discovered Cline's dismembered body—her torso, right arm, and upper legs—in the Feather River off Highway 70 near Storrie and Tobin on June 21, 2020. Her left leg was recovered on June 27, and her right leg was recovered on July 12. Her left arm was never recovered.

Cline suffered 12 to 13 incise wounds to her head, the right side of her neck, and her right hand. Her neck wound was an antemortem (occurred before death) six-inch long gaping wound. Her multiple sharp force injuries caused her death. The incise wound to her neck would have injured vessels that provide blood to the brain and caused her to bleed out.

Cline suffered numerous bone fractures at or around the time of death (perimortem). Her nasal bones, breastbone, ribs, vertebrae, hips, sacrum, and right foot all sustained fractures caused by blunt force.

8

It appeared Cline's legs and left arm had been amputated postmortem with a saw. What remained of her left humerus bore four false starts—a partially completed incise wound that was abandoned mid-way through, meaning the implement was pulled out of the bone before the bone was completely cut.

Criminalists processed defendant's Pontiac on June 10, 2020. They found Cline's blood on the car's rear passenger side door and window and the back of the front passenger seat. They also found blood on the driver's side interior door grab handle that contained a mixture of Cline's and defendant's DNA. In addition, certain items found inside Cline's Pacifica minivan—a piece of cloth, a plastic bag, and a soap wrapper—tested positive for human blood.

Cell phone records indicated that on June 6, 2020, the day of the van fire, defendant's phone was in the vicinity of Robinson Street in Oroville from about 10:56 a.m. to 1:03 p.m. At about 1:06 p.m., the phone left Oroville towards the vicinity of Highway 70 and up Feather River Canyon. The device returned to Oroville at approximately 4:28 p.m.

### 4.    June 14, 2020 – Robert S.

In June 2020, Robert S. lived in a motor home on his family ranch on Milsap Bar Road in the Plumas National Forest in Butte County. On June 11, 2020, the day after defendant drove away from Gina B.'s and Rex C.'s residence, he drove onto Robert S.'s ranch in a black SUV. Defendant knew Robert S.'s cousin's name, so Robert S. allowed him onto the property. He let defendant stay at a trailer that was on an upper part of the ranch.

On the evening of June 13, 2020, Robert S. and defendant shared a couple of beers and some methamphetamine. The two ended up in Robert S.'s motor home. Robert S. had invited defendant to stay there because defendant had said he was scared to walk by himself up to the trailer. Robert S. fell asleep around 11:00 p.m.

9

At approximately 12:30 a.m., June 14, Robert S. felt someone jump on him and felt something across his neck. He stood up and saw blood coming out of his neck. He kicked defendant as hard as he could, who went flying out the door. Robert S. held a blanket against his neck and stood at the door. Defendant snuck around the motor home and cut Robert S.'s hand in the doorway with a knife. Robert S. shut and locked the door, and he screamed for help as loud as he could. Defendant tried to get in approximately every 20 minutes.

At approximately 1:30 a.m., June 14, officers from a SWAT team from the Butte County Sheriff's Department came to the ranch. The SWAT team was there to conduct surveillance until sunrise and then execute an arrest warrant for defendant and a search warrant on the property. About 20 minutes after accessing the property, the officers heard the faint sound of someone yelling for help. As the officers moved toward the source, they heard someone yell, " 'get away from me,' " and they heard lots of banging.

The officers saw a flashlight flicker and heard the sound of someone walking towards them. Using their infrared illuminators while concealed, they saw a man who was carrying a hatchet in his left hand. The man eventually turned around and walked back from where he came. Then the yelling and banging resumed.

The officers pressed toward the motor home. As they turned their lights on, they saw defendant standing at the rear of the motorhome holding a hatchet. The officers announced " 'Sheriff's Office,' " " 'Show me your hands,' " and defendant ran into the woods. Officers found defendant lying in some vines about 30 yards from the motor home, holding the hatchet.

Held at gunpoint, defendant refused to drop the hatchet when ordered. Officers used pepper spray and tased him, and an officer kicked the hatchet from his hand. As officers tried to detain and handcuff him, defendant attempted to pull away aggressively, and he and the officers fought. An officer tased him again and struck him, and the officers were able to handcuff him and take him into custody. On returning to the motor

10

home, an officer noticed that the lower corner of the motor home's door had been bent or pried.

Meanwhile, two officers had gone inside the motor home. Robert S. was holding a blanket saturated with blood to his neck. Blood was actually running out the motor home's front steps. Robert S. had suffered a five-to-six inch laceration across his neck that was still bleeding. Eventually, he received 18 staples in his neck and eight staples in his hand. His neck sustained nerve damage.

B.      Defendant's case

Defendant called no witnesses.

C.      Verdict and sentence

A jury found defendant guilty of first degree murder in the killings of Loreen S. (count 1), Sandra George (count 3), and Vicky Cline (count 4). (Pen. Code, § 187 [unless otherwise stated, statutory section citations that follow are to the Penal Code].) For each of these counts, the jury found true allegations that defendant personally used a dangerous weapon to commit the offenses. (§ 12022, subd. (b)(1).) The jury also found true a multiple murder special circumstance. (§ 190.2, subd. (a)(3).)

The jury found defendant guilty of the attempted murders of Homer S. (count 2) and Robert Robert S. (count 6). (§§ 664/187, subd. (a).) For each of these counts, the jury found true allegations that defendant committed the offenses deliberately and with premeditation, used a dangerous weapon, and personally inflicted great bodily injury, with the injury on Homer being committed against an elderly person. (§§ 664, subd. (a); 12022, subd. (b)(1); 12022.7, subds. (a), (c).)

The jury also found defendant guilty of arson (count 5) and resisting an executive officer (count 7). (§§ 451, subd. (d); 69, subd. (a).)

The trial court sentenced defendant to state prison to serve three terms of life without the possibility of parole on counts 1, 3, and 4; two terms of seven years to life on

11

counts 2 and 6; and an aggregate determinative term of 16 years 8 months: the upper term of three years on count 5, eight months on count 7 (one-third the midterm), one year for each weapon enhancement on counts 1 through 4 and 6, five years for the elderly victim enhancement on count 2, and three years for the great bodily injury enhancement on count 6.

DISCUSSION

I

*Substantial Evidence Supports the Offenses Against Loreen, Homer, and George*

(*Counts 1, 2, and 3*)

Defendant contends that insufficient evidence supports the jury's identification of him as the person who murdered Loreen and George and attempted to murder Homer. He claims that no direct evidence showed he committed the crimes, and the jury could not reasonably infer from the circumstantial evidence that he was the perpetrator.

When we consider the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which any reasonable and rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*Ibid*.)

We presume in support of the judgment the existence of every fact the trier of fact could reasonably infer from the evidence. (*People v. Edwards, supra*, 57 Cal.4th at p. 715.) We do not resolve credibility issues or evidentiary conflicts. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) It is the exclusive province of the trier of fact to determine a witness's credibility and the truth or falsity of the facts upon which a determination depends. (*Ibid*.)

12

We will not reverse a judgment for insufficient evidence " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.)  Where the evidence reasonably justifies the trier of fact's findings, our belief that the evidence might also reasonably justify a contrary finding does not warrant reversing the judgment.  (*Id*. at p. 358.)  Even when, as here, the evidence of guilt is circumstantial, we do not inquire whether the evidence might reasonably be reconciled with the defendant's innocence.  (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

For a reviewing court to set aside a jury's finding of guilt based on the issue of identity, "the evidence of identity must be so weak as to constitute practically no evidence at all."  (*People v. Braun* (1939) 14 Cal.2d 1, 5; *People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.)

Evidence of a different crime or other act may be admissible to establish the defendant's identity as the perpetrator of the charged offense.  (Evid. Code, § 1101, subd. (b).)  The evidence must be relevant to prove identity.  (Evid. Code, § 210; *People v. Leon* (2015) 61 Cal.4th 569, 597-598 (*Leon*).)  Its relevance depends on whether the act is sufficiently similar to the charged offense to support a rational inference of identity.  (*Id*. at p. 598.)

On a spectrum of similarity of acts to prove a material fact other than propensity, the greatest similarity is required to prove identity.  (*Leon, supra*, 61 Cal.4th at p. 598.)  When offered to prove identity, the act and the charged offense "must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  [Citation.]  'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.)  "Requiring a 'highly unusual and distinctive nature [for] both the charged and uncharged offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense.' " (*People v. Roldan* (2005) 35 Cal.4th 646,

706, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The common features, however, "need not be unique or nearly unique; 'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' (*People v. Scott* (2011) 52 Cal.4th 452, 473.)" (*Leon*, at p. 598.)

Substantial evidence supports defendant's convictions on counts 1, 2, and 3. The features common to the attacks on Loreen, Homer, and George, and common to those attacks and defendant's attacks on Cline and Robert S. are sufficiently distinctive when considered together to support the jury's finding that defendant committed counts 1, 2, and 3.

The attacks on Homer, Loreen, and George shared common features. The three victims were vulnerable. Loreen, Homer, and George were elderly. Loreen was 88 years old, Homer was 91, and George was 82.

The attacks occurred after defendant had worked on the victims' properties as an employee of North Valley Tree Service. After completing the tree work, defendant returned to both residences by himself. Although he lived 46 miles away from Homer and Loreen's home, he returned to their home's vicinity four days after servicing their trees on the night before they were attacked. He was there for slightly longer than an hour.

The following morning, defendant left his home early at 5:19 a.m. and drove north towards Chico and Los Molinos. In Chico at 6:09 a.m., his phone most likely was turned off. It had no activity from 6:19 a.m. until 9:34 a.m. when he had returned to Oroville. Loreen and Homer were attacked between 7:25 a.m. and 7:46 a.m. that morning.

As for George's murder, defendant returned to George's house by himself approximately 40 minutes after the tree crew had finished its work and left the site. Although when speaking later with a detective defendant denied returning to George's home, surveillance video recorded defendant leaving the site in his blue Pontiac shortly after the crew left, returning at approximately 2:30 or 2:40 p.m. that afternoon, and

14

leaving again at 2:50 p.m. Phone records noted his presence in the vicinity of George's home twice that day at the same times recorded in the surveillance video. George's body was discovered the next day.

The assailant attacked each victim in the neck with a knife. Loreen was stabbed at the base of her neck above her clavicle on her left side. The knife completely incised her jugular vein, causing her to bleed out. Homer was stabbed on the left side of his neck just above his clavicle. The knife lacerated multiple blood vessels and went down to the spinal canal and to the vertebrae. George suffered an incise wound to her right neck that was four inches long. She was also stabbed in her left shoulder and lacerated on her head, ear, hands, and right knee.

The common features between the attacks on Loreen, Homer, and George when considered together exhibit a distinctive combination. The victims were elderly. They were each attacked within their own homes by an intruder after defendant and his crew from North Valley Tree Service worked at their properties. Defendant returned by himself to the victims' homes after the work was completed. He stabbed and cut the victims in their necks and committed additional lacerations on George.

Other commonalities exist between the attacks on Loreen, Homer, and George and defendant's attacks on Cline and Robert S. Defendant lacerated both Cline's and Robert S.'s necks. Cline's neck wound was a six-inch long gaping incise wound. That wound would have injured vessels that provide blood to the brain and caused her to bleed out. Defendant attempted to kill Robert S. by lacerating Robert S.'s neck with a knife. Also, defendant attacked Robert S. in his residence, and when Robert S. was sleeping and thus vulnerable. The four attacks occurred within only a three-week time span: from May 23 to June 14, 2020.

These common features between the attacks on Loreen, Homer, and George, and also between those victims and Cline and Robert S., when considered together, are

15

substantial evidence from which the jury could identify defendant beyond a reasonable doubt as the perpetrator who attacked Loreen, Homer, and George.

Defendant contends the evidence is insufficient. He concedes Loreen's, Homer's, and George's connections to him through North Valley Tree Service are suspicious, but suspicion is not evidence. Evidence that his cell phone was in the vicinity of the victims' homes at plausible times for their attacks was also insufficient because the expert witness did not define how large an area the term "vicinity" covered.

Regarding the attacks on Loreen and Homer, defendant argues that evidence he traveled towards Chico the morning of their attacks does not establish he also traveled to the victims' home in Los Molinos. The only suspicious evidence of that day was that defendant turned his phone off.

As for the attack on George, defendant argues that although his car and phone were by George's home between 2:40 and 2:50 p.m. that day, no evidence showed George was killed between 2:40 and 2:50 p.m. The evidence also does not show why defendant returned to George's home or how many other people or cars were on George's street between when he left the home and when the body was found the following evening.

There was no physical evidence such as DNA or blood that would link defendant to the attacks on Loreen, Homer, and George. Defendant contends the evidence shows only motive or an opportunity to commit the crimes. He asserts without citation to authority that as with the standard for admitting evidence of third party culpability, substantial evidence must show more than motive or opportunity to commit the crime to support a conviction.

Defendant also argues that the evidence of the attacks against Cline and Robert S. were not relevant to prove identity in counts 1 through 3. He asserts the two sets of crimes did not share similar traits. The attacks on Loreen, Homer, and George involved elderly victims who were strangers to defendant, who utilized the same tree service, and

16

who were attacked in their own homes.  By comparison, Cline was 57 years old, had no relationship with North Valley Tree Service, was an acquaintance of defendant's, and was likely killed in her van after socializing with defendant.  Robert S. was 50 years old, had no connection with North Valley Tree Service, and was attacked in his motor home after he and defendant had been socializing.  Although all the victims suffered stab wounds, defendant argues that death by knife or sharp object is not so unique as to be distinctive.

Defendant's arguments do not cause us to depart from our holding.  Much of his argument concerns evidence that was not presented.  Our concern, however, is the evidence that was presented and whether the jury could reasonably infer from that evidence that defendant was the perpetrator.  As the jury was instructed, neither side was required to produce all physical evidence that might be relevant.  (*People v. Kiihoa* (1960) 53 Cal.2d 748, 752; CALCRIM No. 300.)

Defendant's reliance on the standard for admitting evidence of third party culpability is misplaced.  To admit evidence of third party culpability, a trial court must find that the proposed evidence directly or circumstantially links the third person to the actual perpetration of the crime.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1272-1273.) Evidence showing only a third party's possible motive or opportunity is inadmissible because it is not capable of raising a reasonable doubt of the defendant's guilt.  (*People v. Ghobrial* (2018) 5 Cal.5th 250, 284.)

In comparison, when we review for substantial evidence, we review the entire record in the light most favorable to the judgment to determine whether it contains reasonable, credible evidence from which any reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Edwards, supra*, 57 Cal.4th at p. 715.)  We do not ask whether the evidence is capable of raising a reasonable doubt of a defendant's guilt or can be reconciled with the defendant's innocence.  (*People v. Zaragoza, supra*, 1 Cal.5th at p. 44.)  Where evidence exists in conflict with evidence that supports the judgment, we resolve the conflict in favor of the judgment.

Defendant's criticism of the cell phone expert witness's reference to the "vicinity" of the victims instead of establishing defendant's exact location is off target. The expert explained he could not determine whether defendant's phone was at a victim's specific address because he was relying on historical records that recorded the phone's presence in a particular cell tower sector's coverage area. But the cell phone evidence was still probative. "Vicinity" was not undefined. The expert used the term to refer to defendant's presence in a cell tower sector's coverage area. Maps prepared by the expert showed the jury a particular sector's coverage area, including when defendant was in the same sector coverage area as the victims.

The cell phone evidence also showed defendant's progression from his home in Oroville to and from the vicinity of the victims' residences in Los Molinos and Oroville, and the times when he was traveling. The jury saw how defendant's phone connected with consecutive cell towers as it traveled to Los Molinos and the vicinity of Loreen and Homer's home the night before the attack on them, traveled at least to Chico before being turned off and back to Oroville when Loreen and Homer were attacked, and traveled twice to the vicinity of George's home on the day defendant worked at her property. The cell phone evidence was substantial evidence on which the jury could rely as part of identifying defendant as the perpetrator of counts 1, 2, and 3.

Defendant's presentation of the dissimilarities between the attacks ignores distinctive similarities. Loreen, Homer, and George had retained North Valley Tree Service to trim their trees, defendant performed that work, he returned to the victims' homes by himself, the victims were vulnerable, they were attacked in their homes, and they were stabbed and lacerated in their necks. Additional similarities existed in defendant's attacks on Cline and on Robert S. As he had done with Loreen, Homer, and George, defendant slashed both Cline's and Robert S.'s necks. He attacked them within what were their residences, and he attacked Robert S. when he was vulnerable. The attacks occurred within a three-week period of time. These common features when

considered together are substantial evidence from which the jury could identify defendant beyond a reasonable doubt as the perpetrator of counts 1, 2, and 3.

II

*Consolidation*

Over defense counsel's objection, the trial court consolidated counts 1 through 5 with counts 6 and 7, the crimes against Robert S., which were initially prosecuted in a separate action. Defendant contends the court erred by consolidating counts 1 through 3 with counts 4 through 7.

Initially, the Attorney General contends defendant has forfeited this argument. Defendant at trial argued to keep counts 1 through 5 severed, not counts 1 through 3. We agree with defendant, however, that any objection as to counts 1 through 3 would have been futile. Once the trial court found that all counts were subject to joinder, it was highly unlikely the court would have severed any combination of the counts. Defendant was not required to make futile objections. (*People v. Hopson* (2017) 3 Cal.5th 424, 459.)

Under section 954, a trial court may consolidate two or more accusatory pleadings that charge offenses that are either "connected together in their commission" or "of the same class of crimes or offenses." (§ 954.) "This 'statute permits the joinder of different offenses, even though they do not relate to the same transaction or event, if there is a common element of substantial importance in their commission, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant.' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 455 (*Armstrong*).)

Defendant acknowledges that the five different attacks involved the same class of crimes and thus the cases were statutorily eligible for consolidation. Murder and attempted murder are both assaultive crimes and offenses of the same class. (*People v. Miller* (1990) 50 Cal.3d 954, 987.) Defendant nonetheless contends the trial court abused

its discretion consolidating the actions because factors the court was required to consider weighed in favor of severing counts 1 through 3 from counts 4 through 7.

Even if charges may properly be joined under section 954, the trial court retains discretion to try them separately. (*Armstrong, supra*, 1 Cal.5th at p. 455.) We review a trial court's ruling on a severance motion for abuse of discretion. (*Id*. at pp. 455-456.) To establish an abuse of discretion for consolidating cases, the party seeking severance must " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*Id*. at p. 455.)

We consider the record before the trial court when it made its ruling. (*Armstrong, supra*, 1 Cal.5th at p. 456.) From that record, the trial court was required to " 'assess the likelihood that a jury not otherwise convinced beyond a reasonable doubt of the defendant's guilt of one or more of the charged offenses might permit the knowledge of the defendant's other criminal activity to tip the balance and convict him.' " (*Id*. at p. 455.)

To assess the trial court's exercise of discretion on that issue, we first consider whether evidence of each of the sets of offenses, in this case counts 1 through 3 and counts 4 through 7, would be cross-admissible in hypothetical separate trials. (*Armstrong, supra*, 1 Cal.5th at p. 456.) If the evidence is cross-admissible, " 'that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' " (*Ibid*.)

"If the evidence is not cross-admissible, we then consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citation.] In making this assessment, 'we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2)

whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.] We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.' " (*Armstrong, supra*, 1 Cal.5th at p. 456.)

Defendant first argues that the two sets of crimes were not sufficiently similar to one another to qualify as cross-admissible on the issue of identity. He asserts the only factor recognized under Evidence Code section 1101 that was in dispute was identity, and the offense in counts 1 through 3 did not share common distinctive traits with the other counts to support the inference that defendant committed them all.

We disagree with defendant. By pleading not guilty, defendant placed all elements of each offense at issue, including intent as well as identity. (*People v. Booker* (2011) 51 Cal.4th 141, 171.) To be admissible under Evidence Code section 1101 to prove intent, the offense must be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance. (*People v. Ewoldt, supra*, 7 Cal.4th at p. 402.) Here, defendant's nearly identical means of killing and attempting to kill the victims by stabbing and lacerating their necks within a three-week time period are sufficiently similar for the trial court to have determined at the time of the motion they were cross-admissible in hypothetical trials of the two sets of crimes for both intent and identity. Indeed, we have already determined that evidence of counts 4 through 7 were admissible for purposes of proving identity in counts 1 through 3.

Because the evidence was cross-admissible, we need not consider other factors for assessing the trial court's exercise of discretion. We conclude the trial court did not abuse its discretion in consolidating counts 1 through 3 with counts 4 through 7.

## III

### *Omission of Limiting Instruction*

When evidence is admissible for one purpose but not for another, the trial court on request must instruct the jury to limit the purpose for which the evidence may be considered. (Evid. Code, § 355.) A trial court has no duty to give this instruction sua sponte. (*People v. Smith* (2007) 40 Cal.4th 483, 516.) Defendant contends that because evidence of counts 4 through 7 was not admissible to establish identity in counts 1 through 3, the trial court erred by not instructing the jury to not consider the evidence in counts 4 through 7 to determine defendant's guilt in counts 1 through 3. Defendant acknowledges trial counsel did not request a limiting instruction, but he contends the issue is not forfeited because such a request after the trial court had consolidated the offenses would have been futile. If the argument is forfeited, defendant claims his trial counsel rendered ineffective assistance.

Assuming a request for a limiting instruction would have been futile, we conclude the trial court did not err by not giving the instruction. As we have already determined, the trial court did not err by admitting evidence of counts 4 through 7 to prove identity in counts 1 through 3. Hence, there was no justification for the trial court to give the limiting instruction now raised by defendant.

DISPOSITION

The judgment is affirmed.

/s/_____
HULL, Acting P. J.

We concur:

/s/_____
MAURO, J.

/s/_____
WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.